# SCHEIDLER ET AL. *v.* NATIONAL ORGANIZATION FOR WOMEN, INC., ET AL.

No. 01–1118.   Argued December 4, 2002—Decided February 26, 2003*

---

*Together with No. 01–1119, *Operation Rescue* v. *National Organization for Women, Inc., et al.*, also on certiorari to the same court.

394

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-
NOR, SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ.,
joined. GINSBURG, J., filed a concurring opinion, in which BREYER, J.,
joined, *post*, p. 411. STEVENS, J., filed a dissenting opinion, *post*, p. 412.

*Roy T. Englert, Jr.*, argued the cause for petitioners in
both cases. On the briefs in No. 01–1118 were *Alan Un-
tereiner, Arnon D. Siegel, Kathryn S. Zecca, Sherri Lynn
Wolson, Thomas Brejcha, Deborah Fischer*, and *D. Colette
Wilson*. On the brief in No. 01–1119 were *Jay Alan Seku-
low, Colby M. May, Stuart J. Roth, James M. Henderson,
Sr., Vincent P. McCarthy, Walter M. Weber, Larry L. Crain,
David A. Cortman, Robert W. Ash, Thomas P. Monaghan,*
and *Charles E. Rice.*

*Solicitor General Olson* argued the cause for the United
States as *amicus curiae* urging reversal. With him on the
brief were *Assistant Attorney General Chertoff, Deputy
Solicitor General Dreeben, Lisa Schiavo Blatt*, and *Frank
J. Marine.*

*Fay Clayton* argued the cause for respondents. With her on the brief were *Susan Valentine, Joyce A. Pollack, Lowell E. Sachnoff, A. Stephen Hut, Jr., David W. Ogden, Terry A. Maroney,* and *Kimberly A. Parker.*†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *William H. Pryor, Jr.,* Attorney General of Alabama, and *Charles B. Campbell,* Deputy Solicitor General, and by the Attorneys General for their respective jurisdictions as follows: *Don Stenberg* of Nebraska, *Wayne Stenehjem* of North Dakota, *Mark Barnett* of South Dakota, and *Robert Torres* of the Northern Mariana Islands; for Americans United for Life by *Nikolas T. Nikas, Denise M. Burke, Dorinda C. Bordlee,* and *G. Robert Blakey;* for Catholics for Life, Sacramento, by *James Joseph Lynch, Jr.;* for the Center for Individual Rights by *Michael E. Rosman;* for Concerned Women for America by *Theresa Schrempp* and *Mark L. Lorbiecki;* for Liberty Counsel by *Mathew D. Staver;* for the Life Legal Defense Foundation by *Andrew W. Zepeda* and *Catherine W. Short;* for the National Association of Criminal Defense Lawyers by *William J. Mertens;* for the New York Council of Defense Lawyers by *Richard A. Greenberg, Karl E. Pflanz,* and *Victor J. Rocco;* for the Rutherford Institute by *Jamin B. Raskin, John W. Whitehead,* and *Steven H. Aden;* and for the Seamless Garment Network et al. by *Edward McGlynn Gaffney, Jr., William W. Bassett, G. Robert Blakey, Angela C. Carmella, Robert A. Destro, Marie A. Failinger, Victor Gregory Rosenblum,* and *Gerald F. Uelmen.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Manuel M. Medeiros,* Solicitor General, *Richard M. Frank,* Chief Assistant Attorney General, *Mary E. Hackenbracht,* Senior Assistant Attorney General, *Helen G. Arens,* Deputy Attorney General, *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, and *Daniel J. Chepaitis,* Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Christine O. Gregoire* of Washington, and *Darrell V. McGraw, Jr.,* of West Virginia; for the American Medical Association et al. by *William A. Norris, Michael C. Small,* and *Sandra M. Lee;* for the Feminist Majority Foundation et al. by *Steven G. Gey;* for Former Federal Prosecutors et al. by *Maria T. Vullo;* for the Lawyers' Committee for Civil Rights Under Law by *Joseph R. Bankoff, Thomas Henderson,* and *Nancy Anderson;* for Motorola

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari in these cases to answer two questions. First, whether petitioners committed extortion within the meaning of the Hobbs Act, 18 U. S. C. § 1951. Second, whether respondents, as private litigants, may obtain injunctive relief in a civil action pursuant to 18 U. S. C. § 1964 of the Racketeer Influenced and Corrupt Organizations Act (RICO). We hold that petitioners did not commit extortion because they did not "obtain" property from respondents as required by the Hobbs Act. We further hold that our determination with respect to extortion under the Hobbs Act renders insufficient the other bases or predicate acts of racketeering supporting the jury's conclusion that petitioners violated RICO. Therefore, we reverse without reaching the question of the availability of private injunctive relief under § 1964(c) of RICO.

We once again address questions arising from litigation between petitioners, a coalition of antiabortion groups called the Pro-Life Action Network (PLAN), Joseph Scheidler, and other individuals and organizations that oppose legal abortion,[1] and respondents, the National Organization for Women, Inc. (NOW), a national nonprofit organization that supports the legal availability of abortion, and two health

---

Credit Corp. by *Charles G. Cole, Howard H. Stahl,* and *Bruce C. Bishop;* for the NARAL Foundation/NARAL et al. by *Amy E. Weissman, Sara N. Love,* and *Lawrence S. Ottinger;* and for the Religious Coalition for Reproductive Choice et al. by *George R. Kucik* and *Bonnie J. Campbell.*

Briefs of *amici curiae* were filed for the National Right to Work Legal Defense Foundation, Inc., by *Raymond J. LaJeunesse, Jr.;* for People for the Ethical Treatment of Animals, Inc., by *Jeffrey S. Kerr* and *Craig M. Bradley;* for Texas Black Americans for Life et al. by *Lawrence J. Joyce;* and for Emily Lyons by *Pamela L. Sumners.*

[1] The other petitioners include Andrew Scholberg, Timothy Murphy, and Operation Rescue.

care centers that perform abortions.[2]  Our earlier decision provides a substantial description of the factual and procedural history of this litigation, see *National Organization for Women, Inc.* v. *Scheidler,* 510 U. S. 249 (1994), and so we recount only those details necessary to address the questions here presented.

In 1986, respondents sued in the United States District Court for the Northern District of Illinois alleging, *inter alia,* that petitioners violated RICO's §§ 1962(a), (c), and (d). They claimed that petitioners, all of whom were associated with PLAN, the alleged racketeering enterprise, were members of a nationwide conspiracy to "shut down" abortion clinics through a pattern of racketeering activity that included acts of extortion in violation of the Hobbs Act.[3]

The District Court dismissed respondents' RICO claims for failure to allege that the predicate acts of racketeering or the racketeering enterprise were economically motivated. See *National Organization for Women, Inc.* v. *Scheidler,* 765 F. Supp. 937 (ND Ill. 1991).  The Court of Appeals for the Seventh Circuit affirmed that dismissal.  See *National Organization for Women, Inc.* v. *Scheidler,* 968 F. 2d 612 (1992).  We granted certiorari and reversed, concluding that RICO does not require proof that either the racketeering enterprise or the predicate acts of racketeering were moti-

---

[2] NOW represents a certified class of all NOW members and non-members who have used or would use the services of an abortion clinic in the United States.  The two clinics, the National Women's Health Organization of Summit, Inc., and the National Women's Health Organization of Delaware, Inc., represent a class of all clinics in the United States at which abortions are provided.

[3] The Hobbs Act, 18 U. S. C. § 1951(a), provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."

vated by an economic purpose. See *Scheidler*, 510 U. S., at 256–262. The case was remanded to the District Court for further proceedings.

After a 7-week trial, a six-member jury concluded that petitioners violated the civil provisions of RICO. By answering a series of special interrogatory questions, the jury found, *inter alia*, that petitioners' alleged "pattern of racketeering activity" included 21 violations of the Hobbs Act, 18 U. S. C. § 1951; 25 violations of state extortion law; 25 instances of attempting or conspiring to commit either federal or state extortion; 23 violations of the Travel Act, 18 U. S. C. § 1952; and 23 instances of attempting to violate the Travel Act. The jury awarded $31,455.64 to respondent, the National Women's Health Organization of Delaware, Inc., and $54,471.28 to the National Women's Health Organization of Summit, Inc. These damages were trebled pursuant to § 1964(c). Additionally, the District Court entered a permanent nationwide injunction prohibiting petitioners from obstructing access to the clinics, trespassing on clinic property, damaging clinic property, or using violence or threats of violence against the clinics, their employees, or their patients.

The Court of Appeals for the Seventh Circuit affirmed in relevant part. The Court of Appeals rejected petitioners' contention that the things respondents claimed were "obtained"—the class women's right to seek medical services from the clinics, the clinic doctors' rights to perform their jobs, and the clinics' rights to provide medical services and otherwise conduct their business—were not "property" for purposes of the Hobbs Act. The court explained that it had "repeatedly held that intangible property such as the right to conduct a business can be considered 'property' under the Hobbs Act." 267 F. 3d 687, 709 (2001). Likewise, the Court of Appeals dismissed petitioners' claim that even if "property" was involved, petitioners did not "obtain" that property; they merely forced respondents to part with it. Again relying on Circuit precedent, the court held that " 'as a legal

matter, an extortionist can violate the Hobbs Act without either seeking or receiving money or anything else. A loss to, or interference with the rights of, the victim is all that is required.'" *Ibid.* (quoting *United States* v. *Stillo,* 57 F. 3d 553, 559 (CA7 1995)). Finally, the Court of Appeals upheld the issuance of the nationwide injunction, finding that private plaintiffs are entitled to obtain injunctive relief under § 1964(c) of RICO. We granted certiorari, 535 U. S. 1016 (2002), and now reverse.

We first address the question whether petitioners' actions constituted extortion in violation of the Hobbs Act. That Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U. S. C. § 1951(b)(2). Petitioners allege that the jury's verdict and the Court of Appeals' decision upholding the verdict represent a vast and unwarranted expansion of extortion under the Hobbs Act. They say that the decisions below "rea[d] the requirement of 'obtaining' completely out of the statute" and conflict with the proper understanding of property for purposes of the Hobbs Act. Brief for Petitioners Joseph Scheidler et al. in No. 01–1118, pp. 11–13.

Respondents, throughout the course of this litigation, have asserted, as the jury instructions at the trial reflected,[4] that petitioners committed extortion under the Hobbs Act by using or threatening to use force, violence, or fear to cause respondents "to give up" property rights, namely, "a woman's right to seek medical services from a clinic, the right of

---

[4] The instruction given to the jury regarding extortion under the Hobbs Act provided that "[p]laintiffs have alleged that the defendant and others associated with PLAN committed acts that violate federal law prohibiting extortion. In order to show that extortion has been committed in violation of federal law, the plaintiffs must show that the defendant or someone else associated with PLAN knowingly, willfully, and wrongfully used actual or threatened force, violence or fear to cause women, clinic doctors, nurses or other staff, or the clinics themselves to give up a 'property right.'" Jury Instruction No. 24, App. 136.

the doctors, nurses or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion and fear." Jury Instruction No. 24, App. 136. Perhaps recognizing the apparent difficulty in reconciling either its position (that "giv-[ing] up" these alleged property rights is sufficient) or the Court of Appeals' holding (that "interfer[ing] with such rights" is sufficient) with the requirement that petitioners "obtain[ed] . . . property from" them, respondents have shifted the thrust of their theory. 267 F. 3d, at 709. Respondents now assert that petitioners violated the Hobbs Act by "seeking to get control of the use and disposition of respondents' property." Brief for Respondents 24. They argue that because the right to control the use and disposition of an asset is property, petitioners, who interfered with, and in some instances completely disrupted, the ability of the clinics to function, obtained or attempted to obtain respondents' property.

The United States offers a view similar to that of respondents, asserting that "where the property at issue is a business's *intangible* right to exercise exclusive control over the use of its assets, [a] defendant obtains that property by obtaining control over the use of those assets." Brief for United States as *Amicus Curiae* 22. Although the Government acknowledges that the jury's finding of extortion may have been improperly based on the conclusion that petitioners deprived respondents of a liberty interest,[5] it maintains that under its theory of liability, petitioners committed extortion.

---

[5] The Solicitor General agreed at oral argument that even if we accept the Government's view as to extortion under the Hobbs Act, the cases must be remanded because the generalized jury instruction regarding federal extortion included a woman's right to seek medical services as a property right petitioners could extort from respondents; a right he acknowledged is more accurately characterized as an individual liberty interest. See Tr. of Oral Arg. 30–31.

We need not now trace what are the outer boundaries of extortion liability under the Hobbs Act, so that liability might be based on obtaining something as intangible as another's right to exercise exclusive control over the use of a party's business assets.[6]  Our decisions in *United States* v. *Green*, 350 U. S. 415, 420 (1956) (explaining that "extortion . . . in no way depends upon having a direct benefit conferred on the person who obtains the property"), and *Carpenter* v. *United States*, 484 U. S. 19, 27 (1987) (finding that confidential business information constitutes "property" for purposes of the federal mail fraud statute), do not require such a result.  Whatever the outer boundaries may be, the effort to characterize petitioners' actions here as an "obtaining of property from" respondents is well beyond them.  Such a result would be an unwarranted expansion of the meaning of that phrase.

Absent contrary direction from Congress, we begin our interpretation of statutory language with the general presumption that a statutory term has its common-law meaning. See *Taylor* v. *United States*, 495 U. S. 575, 592 (1990); *Morissette* v. *United States*, 342 U. S. 246, 263 (1952).  At common law, extortion was a property offense committed by a public official who took "any money or thing of value" that was not due to him under the pretense that he was entitled to such property by virtue of his office.  4 W. Blackstone, Commentaries on the Laws of England 141 (1765); 3 R. Anderson, Wharton's Criminal Law and Procedure § 1393, pp. 790–791 (1957).  In 1946, Congress enacted the Hobbs Act, which explicitly "expanded the common-law definition of extortion to include acts by private individuals." *Evans* v. *United States*, 504 U. S. 255, 261 (1992) (emphasis deleted).  While

---

[6] Accordingly, the dissent is mistaken to suggest that our decision reaches, much less rejects, lower court decisions such as *United States* v. *Tropiano*, 418 F. 2d 1069, 1076 (1969), in which the Second Circuit concluded that the intangible right to solicit refuse collection accounts "constituted property within the Hobbs Act definition."

the Hobbs Act expanded the scope of common-law extortion to include private individuals, the statutory language retained the requirement that property must be "obtained." See 18 U. S. C. § 1951(b)(2).

Congress used two sources of law as models in formulating the Hobbs Act: the Penal Code of New York and the Field Code, a 19th-century model penal code. See *Evans, supra,* at 261–262, n. 9.[7] Both the New York statute and the Field Code defined extortion as "the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right." 4 Commissioners of the Code, Proposed Penal Code of the State of New York § 613 (1865) (reprint 1998) (Field Code); N. Y. Penal Law § 850 (1909). The Field Code explained that extortion was one of four property crimes, along with robbery, larceny, and embezzlement, that included "the criminal acquisition of . . . property." § 584 note, p. 210. New York case law before the enactment of the Hobbs Act demonstrates that this "obtaining of property" requirement included both a deprivation and acquisition of property. See, *e. g., People* v. *Ryan,* 232 N. Y. 234, 236, 133 N. E. 572, 573 (1921) (explaining that an intent "to extort" requires an accompanying intent to "gain money or property"); *People* v. *Weinseimer,* 117 App. Div. 603, 616, 102 N. Y. S. 579, 588 (1907) (noting that in an extortion prosecution, the issue that must be decided is whether the accused "receive[d] [money] from the complainant").[8]

---

[7] Representative Hobbs explicitly stated that the term extortion was "based on the New York law." 89 Cong. Rec. 3227 (1943).

[8] The dissent endorses the opinion of the Court of Appeals in *United States* v. *Arena,* 180 F. 3d 380 (CA2 1999), to reach a more expansive definition of "obtain" than is found in the cases just cited. The Court of Appeals quoted part of a dictionary definition of the word "obtain" in Webster's Third New International Dictionary, 180 F. 3d, at 394. The full text of the definition reads "to gain or attain possession or disposal of." That court then resorted to the dictionary definition of "disposal," which includes "the regulation of the fate . . . of something." Surely if the rule of lenity, which we have held applicable to the Hobbs Act, see *infra,* at 408,

We too have recognized that the "obtaining" requirement of extortion under New York law entailed both a deprivation and acquisition of property. See *United States* v. *Enmons,* 410 U. S. 396, 406, n. 16 (1973) (noting that "[j]udicial construction of the New York statute" demonstrated that "extortion requires an intent 'to obtain that which in justice and equity the party is not entitled to receive'" (quoting *People* v. *Cuddihy,* 151 Misc. 318, 324, 271 N. Y. S. 450, 456 (1934))). Most importantly, we have construed the extortion provision of the Hobbs Act at issue in these cases to require not only the deprivation but also the acquisition of property. See, *e. g., Enmons, supra,* at 400 (Extortion under the Hobbs Act requires a "'wrongful' *taking* of . . . property" (emphasis added)). With this understanding of the Hobbs Act's requirement that a person must "obtain" property from another party to commit extortion, we turn to the facts of these cases.

There is no dispute in these cases that petitioners interfered with, disrupted, and in some instances completely deprived respondents of their ability to exercise their property rights. Likewise, petitioners' counsel readily acknowledged at oral argument that aspects of his clients' conduct were criminal.[9] But even when their acts of interference and dis-

---

means anything, it means that the familiar meaning of the word "obtain"—to gain possession of—should be preferred to the vague and obscure "to attain regulation of the fate of."

[9] "QUESTION: But are we talking about actions that constitute the commission of some kind of criminal offense in the process?

"MR. ENGLERT: Oh, yes. Trespass.

"QUESTION: Yes, and other things, destruction of property and so forth, I suppose.

"MR. ENGLERT: Oh, yes. . . .

"QUESTION: I mean, we're not talking about conduct that is lawful here.

"MR. ENGLERT: We are not talking about extortion, but we are talking about some things that could be punished much less severely. It has never been disputed in this case . . . that there were trespasses." Tr. of Oral Arg. 8–9.

ruption achieved their ultimate goal of "shutting down" a clinic that performed abortions, such acts did not constitute extortion because petitioners did not "obtain" respondents' property. Petitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property. Petitioners neither pursued nor received "something of value from" respondents that they could exercise, transfer, or sell. *United States* v. *Nardello,* 393 U. S. 286, 290 (1969). To conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion.

Eliminating the requirement that property must be obtained to constitute extortion would not only conflict with the express requirement of the Hobbs Act, it would also eliminate the recognized distinction between extortion and the separate crime of coercion—a distinction that is implicated in these cases. The crime of coercion, which more accurately describes the nature of petitioners' actions, involves the use of force or threat of force to restrict another's freedom of action. Coercion's origin is statutory, and it was clearly defined in the New York Penal Code as a separate, and lesser, offense than extortion when Congress turned to New York law in drafting the Hobbs Act.[10] New York case

---

[10] New York Penal Law § 530 (1909), Coercing another person a misdemeanor, provided: "A person who with a view to compel another person to do or to abstain from doing an act which such other person has a legal right to do or to abstain from doing, wrongfully and unlawfully,

"1. Uses violence or inflicts injury upon such other person or his family, or a member thereof, or upon his property or threatens such violence or injury; or,

"2. Deprives any such person of any tool, implement or clothing or hinders him in the use thereof; or,

"3. Uses or attempts the intimidation of such person by threats or force,

"Is guilty of a misdemeanor."

law applying the coercion statute before the passage of the Hobbs Act involved the prosecution of individuals who, like petitioners, employed threats and acts of force and violence to dictate and restrict the actions and decisions of businesses. See, e. g., *People* v. *Ginsberg*, 262 N. Y. 556, 188 N. E. 62 (1933) (affirming convictions for coercion where defendant used threatened and actual property damage to compel the owner of a drug store to become a member of a local trade association and to remove price advertisements for specific merchandise from his store's windows); *People* v. *Scotti*, 266 N. Y. 480, 195 N. E. 162 (1934) (affirming conviction for coercion where defendants used threatened and actual force to compel a manufacturer to enter into an agreement with a labor union of which the defendants were members); *People* v. *Kaplan*, 240 App. Div. 72, 269 N. Y. S. 161 (1934) (affirming convictions for coercion where defendants, members of a labor union, used threatened and actual physical violence to compel other members of the union to drop lawsuits challenging the manner in which defendants were handling the union's finances).

With this distinction between extortion and coercion clearly drawn in New York law prior to 1946, Congress' decision to include extortion as a violation of the Hobbs Act and omit coercion is significant assistance to our interpretation of the breadth of the extortion provision. This assistance is amplified by other evidence of Congress' awareness of the difference between these two distinct crimes. In 1934, Congress formulated the Anti-Racketeering Act, ch. 569, 48 Stat. 979. This Act, which was the predecessor to the Hobbs Act, targeted, as its name suggests, racketeering activities that affected interstate commerce, including both extortion and coercion as defined under New York law.[11] Accordingly, the

---

[11] A subcommittee of the Commerce Committee, known as the Copeland Subcommittee, employed a working definition of "racketeering," which included organized conspiracies to "commit the crimes of extortion or coercion, or attempts to commit extortion or coercion, within the definition of

Act contained both a section explicitly prohibiting coercion and a section prohibiting the offense of extortion as defined by the Field Code and New York Penal Code. See ch. 569, §§ 2(a) and 2(b).

Several years after the enactment of the Anti-Racketeering Act, this Court decided *United States* v. *Teamsters*, 315 U. S. 521 (1942). In *Teamsters*, this Court construed an exception provided in the Anti-Racketeering Act for the payment of wages by a bona fide employer to a bona fide employee to find that the Act "did not cover the actions of union truckdrivers who exacted money by threats or violence from out-of-town drivers in return for undesired and often unutilized services." *United States* v. *Culbert*, 435 U. S. 371, 377 (1978) (citing *Teamsters, supra*). "Congressional disapproval of this decision was swift," and the Hobbs Act was subsequently enacted to supersede the Anti-Racketeering Act and reverse the result in *Teamsters*. *Enmons*, 410 U. S., at 402, and n. 8. The Act prohibited interference with commerce by "robbery or extortion" but, as explained above, did not mention coercion.

This omission of coercion is particularly significant in light of the fact that after *Teamsters*, a "paramount congressional concern" in drafting the Hobbs Act "was to be clear about what conduct was prohibited." *Culbert, supra*, at 378.[12] Accordingly, the Act "carefully defines its key terms, such as 'robbery,' 'extortion,' and 'commerce.'" 435 U. S., at 373. Thus, while coercion and extortion certainly overlap to the extent that extortion necessarily involves the use of coercive

---

these crimes found in the penal law of the State of New York and other jurisdictions." S. Rep. No. 1189, 75th Cong., 1st Sess., 3 (1937); *United States* v. *Culbert*, 435 U. S. 371, 375–376 (1978).

[12] As we reported in *Culbert, supra*, at 378: "Indeed, many Congressmen praised the [Hobbs Act] because it set out with more precision the conduct that was being made criminal. As Representative Hobbs noted, the words robbery and extortion 'have been construed a thousand times by the courts. Everybody knows what they mean'" (quoting 91 Cong. Rec. 11912 (1945)).

conduct to obtain property, there has been and continues to be a recognized difference between these two crimes, see, *e. g.,* ALI, Model Penal Code and Commentaries §§ 212.5, 223.4 (1980) (hereinafter Model Penal Code),[13] and we find it evident that this distinction was not lost on Congress in formulating the Hobbs Act.

We have said that the words of the Hobbs Act "do not lend themselves to restrictive interpretation" because they "'manifes[t] . . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'" *Culbert, supra,* at 373 (quoting *Stirone* v. *United States,* 361 U. S. 212, 215 (1960)). We have also said, construing the Hobbs Act in *Enmons, supra,* at 411:

> "Even if the language and history of the Act were less clear than we have found them to be, the Act could not properly be expanded as the Government suggests—for two related reasons. First, this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity" (citations omitted).

We think that these two seemingly antithetical statements can be reconciled. *Culbert* refused to adopt the view that Congress had not exercised the full extent of its commerce power in prohibiting extortion which "affects commerce or the movement of any article or commodity in commerce." But there is no contention by petitioners here that their acts did not affect interstate commerce. Their argument is that

---

[13] Under the Model Penal Code § 223.4, Comment 1, pp. 201–202, extortion requires that one "obtains [the] property of another" using threat as "the method employed to deprive the victim of his property." This "obtaining" is further explained as "'bring[ing] about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another.'" *Id.,* § 223.3, Comment 2, at 182. Coercion, on the other hand, is defined as making "specified categories of threats . . . with the purpose of unlawfully restricting another's freedom of action to his detriment." *Id.,* § 212.5, Comment 2, at 264.

their acts did not amount to the crime of extortion as set forth in the Act, so the rule of lenity referred to in *Enmons* may apply to their case quite consistently with the statement in *Culbert.* "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language." *McNally* v. *United States,* 483 U. S. 350, 359–360 (1987). If the distinction between extortion and coercion, which we find controls these cases, is to be abandoned, such a significant expansion of the law's coverage must come from Congress, and not from the courts.

Because we find that petitioners did not obtain or attempt to obtain property from respondents, we conclude that there was no basis upon which to find that they committed extortion under the Hobbs Act.

The jury also found that petitioners had committed extortion under various state-law extortion statutes, a separate RICO predicate offense. Petitioners challenged the jury instructions as to these on appeal, but the Court of Appeals held that any error was harmless, because the Hobbs Act verdicts were sufficient to support the relief awarded. Respondents argue in this Court that state extortion offenses do not have to be identical to Hobbs Act extortion to be predicate offenses supporting a RICO violation. They concede, however, that for a state offense to be an "act or threat involving . . . extortion, . . . which is chargeable under State law," as RICO requires, see 18 U. S. C. § 1961(1), the conduct must be capable of being generically classified as extortionate. Brief for Respondents 33–34. They further agree that such "generic" extortion is defined as "'obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats.'" *Id.,* at 34 (quoting *Nardello,* 393 U. S., at 290).

This concession is in accord with our decisions in *Nardello* and *Taylor* v. *United States,* 495 U. S. 575 (1990). In *Nardello,* we held that the Travel Act's prohibition, 18 U. S. C.

§ 1952(b)(2), against "extortion . . . in violation of the laws of the State in which committed or of the United States" applies to extortionate conduct classified by a state penal code as blackmail rather than extortion. We determined that if an act prohibited under state law fell within a generic definition of extortion, for which we relied on the Model Penal Code's definition of "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats," it would constitute a violation of the Travel Act's prohibition regardless of the State's label for that unlawful act. · See *Nardello, supra,* at 296 (explaining that regardless of Pennsylvania's labeling defendants' acts as blackmail and not extortion, defendants violated the Travel Act because "the indictment encompasses a type of activity generally known as extortionate since money was to be obtained from the victim by virtue of fear and threats of exposure"). In *Taylor,* relying in part on *Nardello,* we concluded that in including "burglary" as a violent crime in 18 U. S. C. § 924(e)'s sentencing enhancement provision for felons' possessing firearms, Congress meant "burglary" in "the generic sense in which the term is now used in the criminal codes of most States." 495 U. S., at 598. Accordingly, where as here the Model Penal Code and a majority of States recognize the crime of extortion as requiring a party to obtain or to seek to obtain property, as the Hobbs Act requires, the state extortion offense for purposes of RICO must have a similar requirement.

Because petitioners did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed. The 23 violations of the Travel Act and 23 acts of attempting to violate the Travel Act also fail. These acts were committed in furtherance of allegedly extortionate conduct. But we have already determined that petitioners did not commit or attempt to commit extortion.

Because all of the predicate acts supporting the jury's finding of a RICO violation must be reversed, the judgment that petitioners violated RICO must also be reversed. Without an underlying RICO violation, the injunction issued by the District Court must necessarily be vacated. We therefore need not address the second question presented—whether a private plaintiff in a civil RICO action is entitled to injunctive relief under 18 U. S. C. § 1964.

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring.

I join the Court's opinion, persuaded that the Seventh Circuit's decision accords undue breadth to the Racketeer Influenced and Corrupt Organizations Act (RICO or Act). As JUSTICE STEVENS recognizes, "Congress has enacted specific legislation responsive to the concerns that gave rise to these cases." *Post,* at 417 (dissenting opinion). In the Freedom of Access to Clinic Entrances Act of 1994, 18 U. S. C. § 248, Congress crafted a statutory response that homes in on the problem of criminal activity at health care facilities. See *ante,* at 404–405, and n. 9 (noting petitioners' acknowledgment that at least some of the protesters' conduct was criminal, and observing that "[t]he crime of coercion [a separate, and lesser, offense than extortion] more accurately describes the nature of petitioners' actions"). Thus, the principal effect of a decision against petitioners here would have been on other cases pursued under RICO.*

RICO, which empowers both prosecutors and private enforcers, imposes severe criminal penalties and hefty civil lia-

---

*At oral argument, the Government was asked: "[D]o you agree that your interpretation would have been applicable to the civil rights sit-ins?" Tr. of Oral Arg. 25. The Solicitor General responded: "Under some circumstances, it could have if illegal force or threats were used to prevent a business from operating." *Ibid.*

bility on those engaged in conduct within the Act's compass. See, *e. g.,* § 1963(a) (up to 20 years' imprisonment and wideranging forfeiture for a single criminal violation); § 1964(a) (broad civil injunctive relief); § 1964(c) (treble damages and attorneys' fees for private plaintiffs). It has already "evolv[ed] into something quite different from the original conception of its enactors," *Sedima, S. P. R. L.* v. *Imrex Co.,* 473 U. S. 479, 500 (1985), warranting "concern[s] over the consequences of an unbridled reading of the statute," *id.,* at 481. The Court is rightly reluctant, as I see it, to extend RICO's domain further by endorsing the expansive definition of "extortion" adopted by the Seventh Circuit.

JUSTICE STEVENS, dissenting.

The term "extortion" as defined in the Hobbs Act refers to "the obtaining of property from another." 18 U. S. C. § 1951(b)(2). The Court's murky opinion seems to hold that this phrase covers nothing more than the acquisition of tangible property. No other federal court has ever construed this statute so narrowly.

For decades federal judges have uniformly given the term "property" an expansive construction that encompasses the intangible right to exercise exclusive control over the lawful use of business assets. The right to serve customers or to solicit new business is thus a protected property right. The use of violence or threats of violence to persuade the owner of a business to surrender control of such an intangible right is an appropriation of control embraced by the term "obtaining." That is the commonsense reading of the statute that other federal judges have consistently and wisely embraced in numerous cases that the Court does not discuss or even cite. Recognizing this settled definition of property, as I believe one must, the conclusion that petitioners obtained this property from respondents is amply supported by the evidence in the record.

Because this construction of the Hobbs Act has been so uniform, I only discuss a few of the more significant cases. For example, in *United States* v. *Tropiano*, 418 F. 2d 1069 (1969), the Second Circuit held that threats of physical violence to persuade the owners of a competing trash removal company to refrain from soliciting customers in certain areas violated the Hobbs Act. The court's reasoning is directly applicable to these cases:

> "The application of the Hobbs Act to the present facts of this case has been seriously challenged by the appellants upon the ground that the Government's evidence indicates that no 'property' was extorted and that there was no interference or attempted interference with interstate commerce. They assert that nothing more than 'the right to do business' in the Milford area was surrendered by Caron and that such a right was not 'property' 'obtained' by the appellants, as those terms are used in the Act. While they concede that rubbish removal accounts which are purchased and sold are probably property, they argue that the right to solicit business is amorphous and cannot be squared with the Congressional expression in the Act of 'obtaining property.' The Hobbs Act 'speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.' Stirone v. United States, 361 U. S. 212, 215 (1960). The concept of property under the Hobbs Act, as devolved from its legislative history and numerous decisions, is not limited to physical or tangible property or things (United States v. Provenzano, 334 F. 2d 678 (3d Cir. 1964); United States v. Nedley, 255 F. 2d 350 (3d Cir. 1958)), but includes, in a broad sense, any valuable right considered as a source or element of wealth (Bianchi v. United States, 219 F. 2d 182 (8th Cir. 1955)), and does not depend upon a direct benefit being conferred on the

person who obtains the property (United States v. Green, 350 U. S. 415 (1956)).

"Obviously, Caron had a right to solicit business from anyone in any area without any territorial restrictions by the appellants and only by the exercise of such a right could Caron obtain customers whose accounts were admittedly valuable. . . . The right to pursue a lawful business including the solicitation of customers necessary to the conduct of such business has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution (Louis K. Ligget Co. v. Baldridge, 278 U. S. 105 (1928); cf., Duplex Printing Press Co. v. Deering, 254 U. S. 443, 465 (1921) . . . . Caron's right to solicit accounts in Milford, Connecticut constituted property within the Hobbs Act definition." *Id.,* at 1075–1076 (some citations omitted).

The *Tropiano* case's discussion of obtaining property has been cited with approval by federal courts in virtually every circuit in the country. See, *e. g., United States* v. *Hathaway,* 534 F. 2d 386, 396 (CA1 1976); *United States* v. *Arena,* 180 F. 3d 380, 392 (CA2 1999); *Northeast Women's Center, Inc.* v. *McMonagle,* 868 F. 2d 1342, 1350 (CA3 1989); *United States* v. *Santoni,* 585 F. 2d 667, 673 (CA4 1978); *United States* v. *Nadaline,* 471 F. 2d 340, 344 (CA5 1973); *United States* v. *Debs,* 949 F. 2d 199, 201 (CA6 1991); *United States* v. *Lewis,* 797 F. 2d 358, 364 (CA7 1986); *United States* v. *Zemek,* 634 F. 2d 1159, 1174 (CA9 1980).[1] Its interpretation

---

[1] Indeed, the Ninth Circuit's discussion of the nature of property under the Hobbs Act illustrates just how settled this issue was in the Courts of Appeals:

"The concept of property under the Hobbs Act has not been limited to physical or tangible 'things.' The right to make business decisions and to solicit business free from wrongful coercion is a protected property right. *See, e. g., United States v. Santoni,* 585 F. 2d 667 (4th Cir. 1978) (right to make business decisions free from outside pressure wrongfully imposed); *United States v. Nadaline,* 471 F. 2d 340 (5th Cir.) (right to

of the term "property" is consistent with pre-Hobbs Act decisions of this Court, see *Buchanan* v. *Warley*, 245 U. S. 60, 74 (1917) (property "consists of the free use, enjoyment, and disposal of a person's acquisitions without control or diminution"), the New York Court of Appeals, see *People* v. *Barondess*, 133 N. Y. 649, 31 N. E. 240 (1892), the California Supreme Court, *People* v. *Cadman*, 57 Cal. 562 (1881), and with our recent decision in *Carpenter* v. *United States*, 484 U. S. 19 (1987).

The courts that have considered the applicability of the Hobbs Act to attempts to disrupt the operations of abortion clinics have uniformly adhered to the holdings of cases like *Tropiano.* See, *e. g., Libertad* v. *Welch*, 53 F. 3d 428, 438, n. 6 (CA1 1995); *Northeast Women's Center, Inc.* v. *McMonagle*, 868 F. 2d, at 1350; *United States* v. *Anderson*, 716 F. 2d 446, 447–450 (CA7 1983). Judge Kearse's endorsement of the Government's position in *United States* v. *Arena*, 180 F. 3d 380 (CA2 1999), followed this consistent line of cases. The jury had found that the defendants had engaged in "an overall strategy to cause abortion providers, particularly Planned Parenthood and Yoffa, to give up their property

business accounts and unrealized profits) . . . . *Cf. United States v. Hathaway*, 534 F. 2d 386, 395 (1st Cir.) (rejection of narrow perception of 'property'); *Battaglia v. United States*, 383 F. 2d 303 (9th Cir. 1967) (right to lease space in bowling alley free from threats). . . . Chase's right to solicit business free from threatened destruction and physical harm falls within the scope of protected property rights under the Hobbs Act.

.          .          .          .          .

"Evidence of the previously described acts of intimidation and violence suffices. Appellants' objective was to induce Chase to give up a lucrative business. The fact that their threats were unsuccessful does not preclude conviction." *United States v. Zemek*, 634 F. 2d, at 1174 (some citations omitted).

None of the cases following *United States v. Tropiano*, 418 F. 2d 1069 (CA2 1969), even considered the novel suggestion that this method of obtaining control of intangible property amounted to nothing more than the nonfederal misdemeanor of "coercion," see *ante*, at 405 (majority opinion); *ante*, at 411 (GINSBURG, J., concurring).

rights to engage in the business of providing abortion services for fear of future attacks." *Id.*, at 393. Judge Kearse described how this behavior fell well within the reach of the Hobbs Act:

> "[P]roperty may be tangible or intangible, and the property at issue here was the intangible right to conduct business free from threats of violence and physical harm. . . . A perpetrator plainly may 'obtai[n]' property without receiving anything, for obtaining includes 'attain[ing] . . . disposal of,' *Webster's Third New International Dictionary* 1559 (1976); and 'disposal' includes 'the regulation of the fate . . . of something,' *id.* at 655. Thus, even when an extortionist has not taken possession of the property that the victim has relinquished, she has nonetheless 'obtain[ed]' that property if she has used violence to force her victim to abandon it. The fact that the target of a threat or attack may have refused to relinquish his property does not lessen the extortionist's liability under the Hobbs Act, for the Act, by its terms, also reaches attempts. *See* 18 U. S. C. § 1951(a); *McLaughlin v. Anderson,* 962 F. 2d 187, 194 (2d Cir. 1992).
>
> "In sum, where the property in question is the victim's right to conduct a business free from threats of violence and physical harm, a person who has committed or threatened violence or physical harm in order to induce abandonment of that right has obtained, or attempted to obtain, property within the meaning of the Hobbs Act." *Id.*, at 394.

In my opinion Judge Kearse's analysis of the issue is manifestly correct. Even if the issue were close, however, three additional considerations provide strong support for her conclusion. First, the uniform construction of the statute that has prevailed throughout the country for decades should remain the law unless and until Congress decides to amend the

statute. See *Reves* v. *Ernst & Young*, 494 U. S. 56, 74 (1990) (STEVENS, J., concurring); *Chesapeake & Ohio R. Co.* v. *Schwalb*, 493 U. S. 40, 51 (1989) (STEVENS, J., concurring in judgment); *McNally* v. *United States*, 483 U. S. 350, 376–377 (1987) (STEVENS, J., dissenting);[2] *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 268–269 (1987) (STEVENS, J., concurring in part and dissenting in part). Second, both this Court and all other federal courts have consistently identified the Hobbs Act as a statute that Congress intended to be given a broad construction. See, *e. g.*, *Stirone* v. *United States*, 361 U. S. 212 (1960); *United States* v. *Staszcuk*, 517 F. 2d 53 (CA7 1975). Third, given the fact that Congress has enacted specific legislation responsive to the concerns that gave rise to these cases,[3] the principal beneficiaries of the Court's dramatic retreat from the position that federal prosecutors and federal courts have maintained throughout the history of this important statute will certainly be the class of professional criminals whose conduct persuaded Congress that the public needed federal protection from extortion.[4]

I respectfully dissent.

---

[2] Congress corrected the Court's narrow reading of the mail fraud statute in *McNally* by passing 18 U. S. C. § 1346, which overruled *McNally*. See, *e. g.*, *United States* v. *Bortnovsky*, 879 F. 2d 30, 39 (CA2 1989) ("Section 1346 . . . overrules *McNally*"). Of course, Congress remains free to correct the Court's error in these cases as well.

[3] See Freedom of Access to Clinic Entrances Act of 1994, 108 Stat. 694.

[4] The concern expressed by JUSTICE GINSBURG, *ante*, at 411, 412, is misguided because an affirmance in these cases would not expand the coverage of the Racketeer Influenced and Corrupt Organizations Act but would preserve the Federal Government's ability to bring criminal prosecutions for violent conduct that was, until today, prohibited by the Hobbs Act.