The STATE of Ohio, Appellee,

v.

CUNNINGHAM, Appellant.

[Cite as State v. Cunningham, 178 Ohio App.3d 558, 2008-Ohio-5164.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 08–CA–09.

Decided Oct. 3, 2008.

Stephen A. Schumaker, Clark County Prosecuting Attorney, and Amy M. Smith, Assistant Prosecuting Attorney, for appellee.

Rion, Rion & Rion, L.P.A., Inc., and Jon Paul Rion, for appellant.

BROGAN, Judge.

{¶ 1} A jury found Robert Cunningham guilty of child enticement, extortion, coercion, and menacing by stalking, and he was sentenced to prison. In this appeal, he directly challenges only his child-enticement and extortion convictions. He contends that the child-enticement statute under which he was convicted is unconstitutional, that there is insufficient evidence to support a finding of extortion, and that the prosecutor committed misconduct during closing arguments. We recently held unconstitutional the child-enticement statute used to convict him, so we vacate that conviction. But the remainder of the trial court's judgment is affirmed.

{¶ 2} H.D., a 12–year–old girl, was the victim of Robert Cunningham's crimes for the second time in as many years. In 2005, he was convicted of gross sexual imposition for sexually assaulting her and another young girl. He was classified as a sexually oriented offender and received probation. He was ordered not to have any contact with his two victims or unsupervised contact with other minors. In May 2007, his probation ended early based in part on his probation officer's belief that he had consistently obeyed the rules of his probation.

{¶ 3} Some time in 2006, H.D. received an envelope in the mail. She thought it was from her grandmother because her return-address label was on it. Upon opening it, however, she discovered that Cunningham had written the letter inside. More disguised letters from Cunningham followed, some with money,

most telling her how much he longed to see her again. Some of these letters she hid in a dresser drawer; others she threw out. Cunningham admonished her in several letters not to tell anyone that he was writing to her. For a time, she didn't.

{¶ 4} One day, in May 2007, H.D. was walking home from school with her cousin when they heard someone call H.D.'s name. Turning around, they were surprised to see Cunningham driving along behind them. He pulled alongside them and stopped. They walked up to his car and he talked to H.D. for several minutes. She encountered him this way several more times. Sometimes, he gave her money. Once, he asked her to come to his house, and he wanted her to bring a friend. Many times he asked her to get in his car so that he could drive her home, but H.D. never did. He would also instruct her, "[D]on't tell your grandma or anybody that you saw me or I saw you."

{¶ 5} H.D. soon discovered that he also wanted her to do something. Every time he talked to her, he demanded that she tell everyone that her testimony that had helped convict him two years earlier was a lie. She refused, so he threatened her. He passed her notes that he had written. "When you're done reading it, give it back to me," he would tell her. He wrote the notes, as he later admitted to police, as threats to pressure her into recanting. When he was arrested, police found in his wallet several notes, which he had not yet shown H.D., many of which contained threats, spelled out in sexually explicit language, that if she did not tell people that she had lied, he would expose her past sexual activity to her parents. He also threatened to expose this when she resisted talking to him. He held up an envelope for her to see and threatened that if she would not see him, he would use it to send a letter to her parents. Although H.D. did not know what the letter said, based on the notes she had read and on what she knew he knew, she felt fairly certain what it was that he was threatening to expose. Cunningham was successful in making her afraid. Her stepmother, Sarah, noticed a change in H.D. whenever she was confronted with issues dealing with him. She was just not herself. She "gets upset, very nervous, sort of shameful," Sarah noticed. "[S]he just kind of coils back into herself."

{¶ 6} The last time H.D. encountered Cunningham before he was arrested was while she walked home from school with a group of friends. As they neared one of their houses, Cunningham pulled along side them and began trying to talk to H.D. When Katie (the mother of the friend whose house they were near) stepped outside her house, she saw the group placing themselves between H.D. and Cunningham's car. Thinking that they were fighting, she marched up to the group in time to hear Cunningham say to H.D., "It's okay, honey. You can get in." Grasping the situation, she quickly grabbed a panicked and scared looking H.D. and brought her into her home. H.D.'s stepmother, Sarah, soon received a

phone call from a distressed-sounding Katie. Sarah arrived to find her step-daughter visibly upset. Once they were home, Sarah and H.D. talked about what had happened. Eventually, H.D. showed Sarah the hidden letters from Cunningham. The following day Sarah called the police, and Cunningham was eventually arrested.

{¶ 7} The grand jury indicted him on charges of child enticement (R.C. 2905.05) with a specification of a prior offense, extortion (R.C. 2905.11), coercion (R.C. 2905.12), and menacing by stalking (R.C. 2903.211) with two specifications--a prior offense and a minor victim. A one-day jury trial was held in December 2007. All the available letters and notes that Cunningham had written were shown—and many were read—to the jury. Despite Cunningham's objections, the trial judge admitted each into evidence. The following day, closing arguments were made by both sides. While reminding the jury of the evidence against Cunningham, the prosecutor read, a second time, portions of a particularly graphic note. Later that same day, the jury returned from its deliberations and delivered its verdict: Guilty on all counts.

{¶ 8} The trial court sentenced Cunningham to seven and one-half years in prison—one year for child enticement, 18 months for menacing by stalking, and five years for extortion.[1] Cunningham now appeals his child-enticement and extortion convictions based on four alleged errors.

{¶ 9} He first assigns error to his child-enticement conviction. He contends that we have found the statute for this offense unconstitutional. Cunningham correctly states, and the state concedes, our recent holding in *State v. Chapple*, 175 Ohio App.3d 658, 2008-Ohio-1157, 888 N.E.2d 1121. There we held that R.C. 2905.05, as it was then written, criminalized even innocent solicitations. Consequently, we held that it is over broad and facially unconstitutional. Cunningham was convicted under this version of the statute. Therefore, his first assignment of error must be sustained.

{¶ 10} For his second assignment of error, Cunningham contends that the jury improperly found him guilty of extortion because the state failed to present legally sufficient evidence for each essential element. " 'Sufficiency' is a term of art meaning that legal standard which is applied to determine * * * whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. That is, tautology-free, "whether [a] rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of [extortion] proven beyond a reasonable doubt." *State v. Fritz*, 163 Ohio App.3d 276, 2005-

---

1. Coercion merged with extortion for sentencing purposes, likely because they are allied offenses.

Ohio-4736, 837 N.E.2d 823, at ¶ 10. We will marshal the evidence that the state presented to determine whether it is sufficient to support the essential elements.

{¶ 11} The pertinent portion of the extortion statute, the portion used to find Cunningham guilty, reads: "No person, with purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act, shall do any of the following: * * * Expose or threaten to expose any matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal or business repute, or to impair any person's credit." R.C. 2905.11(A)(5). Cunningham contests the sufficiency of the state's evidence for three essential elements. He contends that there is insufficient evidence to prove, first, that he sought to obtain a "valuable thing or valuable benefit"; second, that he sought an "unlawful act"; and third, that he threatened to expose a "matter tending to subject any person to hatred, contempt, or ridicule, or to damage any person's personal * * * repute."

### Valuable Thing or Benefit

{¶ 12} The question of sufficiency on a particular element is a mixed question of law and fact. That is, what does the statute say the state must prove and what evidence did it offer as proof? For this element, Cunningham does not challenge the state's evidence per se but raises a question of law: how the phrase "valuable thing or valuable benefit" ought to be construed. He asserts that it must be construed to mean that the state must prove a "valuable thing or valuable benefit" that is tangible. If it were construed to include intangibles, he argues, nothing would distinguish extortion from the separate statutory offense of coercion as the elements and evidence would be the same for both. In his case, he points out, he was found guilty of extortion for trying to pressure H.D., using threats, into saying that she lied. He was also found guilty of coercion for trying to coerce her, using threats, to say that she lied. In short, he was found guilty of two offenses based on the same conduct (threatening H.D.) that sought the same intangible thing (her recantation).

{¶ 13} The question raised, then, is one of statutory meaning, which is the court's job to determine. Our duty is to give effect to the legislature's intended meaning. See State v. Johnson, 116 Ohio St.3d 541, 2008-Ohio-69, 880 N.E.2d 896. "When confronted with allegations of ambiguity a court is [first] to objectively and thoroughly examine the [statute] to attempt to ascertain its meaning." *State v. Porterfield,* 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, at ¶ 11. And, "Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed." Id. Thus, there is no need to invoke the rules of statutory construction to interpret words or phrases whose meanings are facially manifest; the statute need only be applied. See *Sherwin–*

*Williams Co. v. Dayton Freight Lines, Inc.*, 112 Ohio St.3d 52, 2006-Ohio-6498, 858 N.E.2d 324, at ¶ 15.

{¶ 14} The meaning of "valuable thing and valuable benefit" is clear and unambiguous. Common usage of the words "thing" and "benefit" includes reference to intangibles. See Webster's Ninth New Collegiate Dictionary (1990) 1302 (defining "benefit" as "something that promotes well-being," or "useful aid"). Moreover, prior cases have found intangibles encompassed by the meaning of the words "thing" and "benefit." See *State v. Akers* (June 2, 2000), 6th Dist. No. S–99–035, 2000 WL 706795 (finding that freedom from jail was a valuable benefit), *State v. Lutz*, 8th Dist. No. 80241, 2003-Ohio-275, 2003 WL 152837 (finding the same), *State v. Workman* (1984), 14 Ohio App.3d 385, 14 OBR 490, 471 N.E.2d 853 (finding that the failure of a victim witness to testify would be something of value).

{¶ 15} Moreover, even when viewed in the context of the criminal code, the words "thing" and "benefit" retain their common meanings. Cunningham's assertion that this interpretation results in extortion and coercion being identical offenses is wrong, and is based on a misreading of his cited authorities. Far from supporting his conclusion, they actually support ours.[2] He primarily relies on the Model Penal Code and the United States Supreme Court's use of it in *Scheidler v. NOW, Inc.* (2003), 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991, to construe the federal Hobbs Act (which defined the offense of commercial extortion). The correct reading of these, however, reveals that neither the Model Code nor *Scheidler* restricts the meaning of the word "property" to tangible property. On the contrary, *Scheidler* expressly rejected the notion. Id. at 402, 123 S.Ct. 1057, 154 L.Ed.2d 991, fn. 6. Indeed, the court did not exclude the possibility under the Hobbs Act "that liability might be based on obtaining something as intangible as another's right to exercise exclusive control over the use of a party's business assets." Id. at 402, 123 S.Ct. 1057, 154 L.Ed.2d 991.

{¶ 16} The central issue in *Scheidler* is what the act means by the requirement that the extorter "obtain" the property of another.[3] One of the court's concerns

2. Cunningham's reliance on *State v. Stone* (Mar. 26, 1992), 4th Dist. No. 90 CA 23, 1992 WL 56778, is similarly misplaced. He tells us that this court held that a "valuable thing or valuable benefit" could only be tangible. He is wrong. The issue in *Stone* was the meaning of "valuable," not "thing" or "benefit." *Stone* says that "valuable" "must be interpreted to include only things or benefits that have a monetary value." Id. at *6. It does not say that the things or benefits must be tangible.

3. In the Model Code and the Hobbs Act, extortion is a theft-of-property crime. Thus, both require the alleged extorter to obtain the "property" of another. Ohio's criminal code groups extortion with crimes of kidnapping and coercion. Moreover, it is more of an inchoate crime of attempt that requires the alleged extorter simply to act with a purpose to obtain a "valuable

was not, as Cunningham suggests, expanding the definition of "property" to intangible property, but rather, the removal of this requirement altogether. The effect of this, said the court, would be to "eliminate the recognized distinction between extortion and the separate crime of coercion." Id. at 405, 123 S.Ct. 1057, 154 L.Ed.2d 991. The court said, citing the Model Code, "[W]hile coercion and extortion certainly overlap to the extent that extortion necessarily involves the use of coercive conduct to obtain property, there has been and continues to be a recognized difference between these two crimes." Id. at 407–408, 123 S.Ct. 1057, 154 L.Ed.2d 991. The recognized difference to which *Scheidler* refers is extortion's requirement that one "obtains [the] property of another." Id. at 408, 123 S.Ct. 1057, 154 L.Ed.2d 991, fn. 13 (quoting the Model Code).

{¶ 17} Similarly, under Ohio law, while coercive conduct is necessary for extortion, it is not sufficient. Although the same coercive conduct can underlie both offenses, the purpose and effect of the conduct differs. The language of these two offenses bears this out. On the one hand, coercion requires proof of a "purpose to coerce another into taking or refraining from action concerning which the other person has a legal freedom of choice." R.C. 2905.12(A). The effect is to deprive another of the freedom to act. Extortion, on the other hand, requires proof of a "purpose to obtain any valuable thing or valuable benefit or to induce another to do an unlawful act." R.C. 2905.11(A). The effect of extortion is to coerce another in order to obtain something to which the extorter has no right. The important distinction, then, is extortion's additional evidentiary requirement of an intent to obtain something. It matters not that the thing sought is intangible.

{¶ 18} Cunningham sought to obtain an intangible "valuable benefit" from H.D. Despite his assertions to the contrary, we are unconvinced that he was seeking to obtain her recantation for its own sake. Rather, we think that he wanted to obtain the valuable benefits that her recantation would bring–benefits such as the ability to deny that he had committed a crime, which would help restore his reputation and permit him to challenge his conviction.[4] That he sought these benefits, and not simply the recantation, is a permissible inference that a reasonable juror could, and most likely would, draw from the evidence.

---

thing or valuable benefit," but it does not require the alleged extorter to have actually obtained the thing or benefit.

4. Shakespeare recognized the importance of individual reputation in 1604:
"Who steals my purse steals trash; 'tis something, nothing;
"Twas mine; 'tis his, and has been slave to thousands;
"But he that filches from me my good name
"Robs me of that which not enriches him,
"And makes me poor indeed." Othello, Act III, Scene iii.

{¶ 19} A rational juror, then, viewing the evidence offered in support of this element in the light most favorable to the state, and drawing all reasonable inferences, could find that Cunningham threatened H.D. into recanting because he wanted to obtain the "valuable benefits" that the recantation would bring. Therefore, we find that the evidence in support of this element is legally sufficient.

**Unlawful Act**

{¶ 20} Cunningham next asserts that the evidence is not sufficient to find that he made threats to induce another to do an "unlawful act." It would not be unlawful, he argues, for H.D. to recant. To prove extortion, the state needed to show that Cunningham threatened H.D. with the purpose either to obtain a valuable thing or benefit, or alternatively, to induce her to do an "unlawful act." R.C. 2905.11(A). Because "valuable benefit" and "unlawful act" are disjunctives, the evidence need show only one. We just determined that there is sufficient evidence to find that Cunningham threatened H.D. because he wanted to obtain "valuable benefits." As a result, we do not have to determine also whether recanting would be an "unlawful act." [5]

**Threats**

{¶ 21} Finally, Cunningham asserts that there is insufficient evidence that the "matter" that he threatened to expose would tend to subject H.D. to "hatred, contempt, or ridicule, or to damage" her reputation. Here, he does challenge the state's evidence directly. He argues that the state presented no evidence that the envelope with which he threatened H.D. contained such a matter. Therefore, he concludes, without knowing what was inside, the jury could not have properly concluded that the contents of the envelope concerned a matter that could be characterized in the way required by the extortion statute.

{¶ 22} Although Cunningham raises only an issue of fact, we begin with an issue of law, namely, the meaning of "matter." Again, we need not engage the rules of statutory construction because the meaning of "matter" is clear and unambiguous. Turning to the dictionary for guidance on common usage, we find the word "matter" defined as a "subject of concern, feeling, or action." The American Heritage Dictionary of the English Language (4th Ed. 2004). A matter, then, refers to a vaguely specified concern. Cunningham admitted to police that he had written the notes intending to pressure H.D. into recanting. All the available notes that he had written were admitted into evidence and were before the jury.

---

5. We point out, however, that in order to be guilty of coercion, H.D.'s act of recanting could not have been unlawful, for the offense of coercion concerns only the freedom to choose lawful actions. See R.C. 2905.12(A).

The common subject that links them together is H.D.'s sexual relationships. We suspect that few would disagree that a young girl would want to prevent others from knowing this information. Further, it is not hard to accept the notion that exposure of this subject could subject a young girl to the opprobrium of others and consequent damage to her reputation. Cunningham must have thought so; otherwise, how would his threats create the fear in her that he needed to force her to recant?

{¶ 23} Cunningham's argument that H.D. did not know the precise content of the envelope is unavailing because the exact language is immaterial. Regardless of the exact words used, a reasonable juror could find that the matter that he threatened to expose was one that would tend to damage her reputation. Therefore, there is sufficient evidence to meet this element.

{¶ 24} The purpose behind Cunningham's threats was broader than just to coerce a particular course of action. He also used fear in an attempt to get something to which he was not entitled. We hold that when viewing the evidence in the light most favorable to the state, and drawing all reasonable inferences, a reasonable juror could find evidence to support each of the contested elements of the crime of extortion. Accordingly, we overrule Cunningham's second assignment of error.

{¶ 25} Cunningham's third assignment of error contends that the prosecutor committed misconduct. His fourth assignment of error contends that his trial counsel was ineffective for failing to object to the misconduct. We address these alleged errors together because they both raise the common issue of whether the prosecutor in this case committed misconduct.

{¶ 26} "An appellate court need not consider an error that was not called to the attention of the trial court at a time when such error could have been avoided or corrected by the trial court." *State v. Carter*, 89 Ohio St.3d 593, 598, 734 N.E.2d 345. Cunningham did not object to the alleged prosecutorial misconduct when it occurred, as he concedes by claiming ineffective assistance of counsel. Still, although we "need not consider" such an error, we may review it for plain error, a more deferential standard of review than would otherwise apply. Id. Plain error exists if the outcome of the case would have been different had the error not occurred. See Crim.R. 52. We must first, then, determine whether an error occurred, before we can judge its effect (and before we can determine whether his trial counsel was ineffective).

{¶ 27} A prosecutor commits misconduct during closing arguments when he makes an improper statement that "prejudicially affect[s] substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Inflammatory statements—those that may "inflame the passions

and prejudice of the jury"—are among those statements that are deemed improper. *State v. Draughn* (1992), 76 Ohio App.3d 664, 671, 602 N.E.2d 790. Such statements wrongly "invite the jury to judge the case upon standards or grounds other than" those upon which it is obligated to decide the case, namely, the law and the evidence. Id. See also *Taylor v. Kentucky* (1978), 436 U.S. 478, 486, 98 S.Ct. 1930, 56 L.Ed.2d 468 (stating that a defendant has a "constitutional right to be judged solely on the basis of proof adduced at trial").

{¶ 28} The prosecutor did not commit misconduct by reading Cunningham's note to the jury. Cunningham asserts that the note read by the prosecutor during closing arguments contained inflammatory statements (sexually explicit language) that the jury should not have heard. Yet the transcript reveals that this was the second time that the jury had heard what Cunningham wrote in this particular note. Moreover, this note had already been admitted into evidence. We fail to understand, and Cunningham does not explain, how inviting the jury to base its decision on properly admitted evidence could possibly be considered misconduct. Therefore, we find no error, and we overrule his third assignment of error.

{¶ 29} Cunningham's attorney could not have been ineffective for failing to object to a phantom error. Therefore, we will not decide Cunningham's fourth assignment of error. It is moot. See App.R. 12(A)(1)(c).

{¶ 30} The judgment of the trial court is affirmed in part and reversed in part. The second, third, and fourth assignments of error are overruled, and to that extent we affirm. But we sustain the first assignment of error, so we vacate Cunningham's child-enticement conviction and remand the cause for resentencing.

Judgment affirmed in part
and reversed in part,
and cause remanded.

GRADY and DONOVAN, JJ., concur.