THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JOSEPH CUDDIHY, Defendant.

Court of General Sessions, New York County, April 24, 1934.

*William C. Dodge, District Attorney [Louis Capozzoli, Assistant District Attorney*, of counsel], for the People.

*John J. Bennett, Jr., Attorney-General [John F. X. McGohey* and *Benjamin Heffner* of counsel], for the State.

*Henry G. Littau*, for the defendant.

FRESCHI, J. The defendant stands indicted for extortion and coercion. The first count charges that the defendant obtained feloniously from Patrick Flynn, with his consent, on September 25, 1933, the sum of seventeen dollars and fifty cents induced by the wrongful use of fear and threats to discharge him from his employment unless he should pay defendant said moneys, in violation of sections 850 and 851 of the Penal Law.

The second count accuses the defendant of wrongfully and unlawfully using and attempting the intimidation of said Flynn by means of a threat to discharge and cause him to be discharged from his employment as a plasterer's helper, with a view to compel the said Flynn to do an act which he had a legal right to refrain from doing, to wit, to compel him to pay the said defendant the sum of seventeen dollars and fifty cents, referred to in the first count, violative of section 530 of the Penal Law.

According to the testimony before the grand jury, this defendant, an officer of the Cuddihy Plastering Corporation, Inc., employed Patrick Flynn, the complainant, as a plasterer's helper at eight dollars and fifty cents per day. The employment commenced on September 18, 1933, and continued for five or six weeks thereafter. At the end of the first week, Flynn received his wages for five days' work from Cuddihy himself in a pay envelope containing forty-two dollars and fifty cents. On the following Monday the defendant asked complainant to return out of such wages seventeen dollars and fifty cents. Similar weekly payments by Flynn to defendant continued while the former was so employed. The complainant testified that the defendant said to him on September 25, 1933: " Well, if you want to hold your job, there are lots of men; I can get lots of men cheaper. If you want to hold on to your job, you got to give it back  *  *  *  give back $17.50 for a five-day week." Flynn further testified that he paid back such moneys only to hold his job; and he added, in testifying about his fear: " I knew I would lose my job if I didn't give it back." After that date, the complainant claims that when defendant came on a Friday or Monday, he ordered him off the job, saying: " I will take it now, and if anybody is around tell them that you owed me money and gave it back to me." On the question of intent, the minutes contain testimony of an alleged similar transaction. Flynn also testified

he was a member of a plasterer's union and that the scale of wages in New York city was seven dollars and fifty cents per day. There seems to be no question about the rebate having been paid. Its purpose is obvious. The defendant claims the act of payment by complainant to defendant was voluntary and in no sense compulsory. The testimony supports this contention. Flynn was asked by one of the grand jurors: " When were you first told in this 1933 employment, in September, that you would be expected to return this $17.50 for the week's work, three and a half a day? " Complainant answered: " I understood that when I went on the job. Q. So you knew when you took the job that you would only get $5 a day? A. I didn't know exactly. Q. You knew you would have to give some money back? A. The $8.50 he paid me. He told me I would have to give it back to hold on to my job. Q. Before you started working, you knew you would have to give some money back? A. He told me if I wanted to hold on to my job." By the Attorney-General: " Q. He wants to know if the day prior, the grand juror wants to know if, when you went to work, you knew he was going to take some money out of your pay? A. No, sir. I didn't know anything about that, not until I came on the job." By a juror: " When did you have the first idea, when did anybody tell you that you were expected to return $17.50 every week? A. Out in Creedmoor, the State Hospital. Q. What year was that? A. 1933. After I came from Bedford Hills. Q. *Before September 18th, 1933? A. Yes, sir.*"

From this testimony it is clear that Flynn had agreed to pay back part of the moneys he received. Flynn was thus accorded the right to work; and he was free to refuse to work under these conditions. He was a free agent. He did not quit. The agreement in in itself was not unlawful. There is nothing in the record showing that this was an unlawful combination to evade the income tax laws or any other law. We are not here concerned with consideration of the dangers of unfair competition or the injuries that may flow from it. Cheaper labor, perhaps, enabled defendant to compete at some advantage. The question of public policy, boycott or of restraint of trade to accomplish a certain result do not enter into this consideration. Clearly, these parties contemplated a means of deceiving the union of which Flynn was a member. The subsequent manner in which and the place where the repayment of the money was made in order to carry out this purpose, indicates the concealment of the fact from any union men who might be around at the time. The method used was to pretend that Flynn was employed at eight dollars and fifty cents per day by giving him the pay envelope weekly for the full amount

and then requiring a part repayment. He was not a victim of this practice; he was a party to an established understanding. In fact, Flynn testified in this regard as follows: " Q. Did he make that statement to you practically every time that he collected the money — that if you did not pay you would lose your job? A. Well, not every time, no, not all the time." Flynn had had previous similar experiences with the defendant. He knew his methods, and yet he continued to seek such employment from and work for the defendant under the circumstances. Each of the parties had a " right of choice " in the matter. If such an arrangement existed as appears in this testimony, then the money was due defendant from Flynn.

Extortion is the obtaining of property from another, with his consent induced by a *wrongful* use of force or fear. Fear such as will constitute extortion, may be induced by a threat: to do an *unlawful* injury to the property of the individual threatened. The common-law offense of extortion, affecting public office, has been extended by statute so as to include acts of private individuals. (2 Cyc. Crim. Law, § 1198; 3 Whart. Crim. Law [11th ed.], § 1895.)

In *Bossert* v. *Dhuy* (221 N. Y. 342, 352) Judge CHASE wrote: " ' It is not the duty of one man to work for another unless he has agreed to, and if he has so agreed but for no fixed period, either may end the contract whenever he chooses. The one may work, or refuse to work, at will, and the other may hire or discharge at will. The terms of employment are subject to mutual agreement, without let or hindrance from anyone. If the terms do not suit, or the employer does not please, the right to quit is absolute, and no one may demand a reason therefor.' " At page 365 the court further said: " Voluntary orders by a labor organization for the benefit of its members and the enforcement thereof within the organization is not coercion." Among the " threats " which may constitute extortion is the 'doing of an *unlawful* injury to the " property " of the individual threatened. Labor constitutes property. (*People ex rel. Short* v. *Warden*, 145 App. Div. 861, at p. 863.) (See, also, *Springfield F. & M. Ins. Co.* v. *Allen*, 43 N. Y. 389, 395.) A discussion as to what is property within the meaning of the statute under consideration in this case is to be found in *People* v. *Barondess* (133 N. Y. 649), adopting the dissenting opinion of DANIELS, J. (61 Hun, 571, 586).

The right to labor, which is another way of saying the right to contract in the open market for one's services (*People* v. *Barondess*, 61 Hun, 571, at p. 585), is his property to be employed and used at will for or without compensation and upon such terms, if acceptable, as another may offer under agreement for its use. It is " essential

to the orderly pursuit of happiness by free men." The State has not endeavored to fix a standard of value for labor by a minimum scale of wages for such services as were here rendered. Concededly, there was no public work involved in this case.

Mr. Justice ROBERTS wrote in *Nebbia* v. *New York* (291 U. S. 502, 523; 78 L. Ed. at p. 563): "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute."

In *Adkins* v. *Children's Hospital* (261 U. S. 525, 545) it was said: "That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause [Fifth Amendment] is settled by the decisions of this Court and is no longer open to question."

The court fully recognizes, as was stated in *Curran* v. *Galen* (152 N. Y. 33, 37), that "public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling. * * * Every citizen is deeply interested in the strict maintenance of the constitutional right freely to pursue a lawful avocation, under conditions equal as to all, and to enjoy the fruits of his labor, without the imposition of any conditions not required for the general welfare of the community." (See *Slaughter House Cases*, 16 Wall. [83 U. S.] 36, 116, 122; *People* v. *Gillson*, 109 N. Y. 389, 399.) There has been in the instant case no interference with the liberty or the property rights of Flynn. He was free to pursue his lawful calling and to dispose of his labor and enjoy the fruits thereof. Had there been here a malicious interference by a third party with Flynn's right to the free disposal of his labor, or a threat to have him discharged as an inducement to the payment of money and by means of which money was obtained, then unquestionably the statutory crime of extortion would have been proven. The learned Attorney-General contends, however, that there is a question of fact presented as to whether Flynn and the defendant entered into the agreement claimed by the latter, and that the contradictory testimony of the complainant in that regard should be ignored and the whole question left to a trial jury. It is my judgment that the absence of such an agreement would not in any way strengthen the prosecution's case. I cannot agree with the claims in the Attorney-General's brief: (1) "That a property right existed in Patrick Flynn's position with the defendant; (2) that, however legal the means adopted were that the end being illegal, the entire series of acts becomes criminal."

Once it is contracted for and man's labor is given for compen-

sation, it is fair to assume that the employment on a particular work will continue while there is more work of the same sort to be done, especially where both parties carry out their agreement; but this relationship, necessarily consisting in the exchanging of one thing for another, does not create vested rights in the position with relation to the future work. It has not been claimed that the defendant breached his agreement of employment in any way. The relationship of the employer and the employee and *vice versa* is not property *in se*. The relationship is a mere condition incidental to and arising from certain property rights and the interchange thereof. It is a fair inference from all the testimony in this case that the complainant Flynn did that which he had agreed to do with part of the money he received as wages. The defendant made it plain to Flynn that the only way in which he could have kept his job was either by conforming to the first agreement between the parties or entering into a new agreement. Thus, he voluntarily paid back what he owed and continued working for many weeks; and thereby enjoyed the privilege, for such it is — not a vested right — to continue in this gainful occupation. The prosecuting authorities contend that the means selected by defendant to obtain the money constitute unlawful threats to deprive Flynn of his work, by which his right to labor was injured by these compulsory measures. They assert that there was only a color of right on the part of the defendant to discharge complainant, and that since his apparent purpose was unlawful, therefore, the act complained of becomes unlawful, thus bringing the case within the rule of *People* v. *Sheridan* (186 App. Div. 211, 212). But the conduct of these parties, taking its legal color and quality more or less from the circumstances surrounding it and the intent or purpose which controls it, as was stated in *People* v. *Hughes* (137 N. Y. 29, at p. 39), leads to the inevitable conclusion that the act in question was lawful. Most of the cases cited by the Attorney-General deal with extortion where the individual was threatened that if he did not pay the money demanded employees would be persuaded to absent themselves from work, or to continue a boycott. The " intimidating attitude " and the " overt act " were openly combined in these cases, and used by a party who had no contractual relation to the person so threatened. If the case at bar presents an evil practice about which governmental authority may be constitutionally invoked, the remedy is not with the judicial branch of government, but, rather, with the legislative.

*People ex rel. Short* v. *Warden* (*supra*), cited by the Attorney-General in support of his contention, is not a parallel case. In that case the defendant had threatened to intercede with the complain-

ant's employer in an effort to cause complainant to lose his position unless the defendant were paid a certain sum of money. The People also rely upon *People* v. *Sheridan* (*supra*). That case is distinguishable. They quote from the opinion therein the following: "Unlawfulness lies in the motive. If its purpose be unlawful, then the act (which under other conditions might be justified) becomes unlawful." No one should challenge the correctness of this principle. Other cases submitted and argued upon by the People are *People ex rel. Damato* v. *Kempner* (163 App. Div. 966); *People* v. *Kaplan* (236 id. 795; affd., 262 N. Y. 507); *People* v. *Hughes* (137 id. 29). They have all been considered; and they all hold in effect that the property or money extorted must belong to another. It will suffice as an answer to quote from *People* v. *Griffin* (2 Barb. 427, 430): The intent to extort or gain must be wrongful or unlawful " to obtain that which in justice and equity the party is not entitled to receive." The ultimate object and intent of the party here accused was not the " *lucri causa* " which must always characterize the act. (See, also, *People* v. *Wickes*, 112 App. Div. 39.) Flynn had been paid more than was due him; and he was obligated to return the amount in question. This is not a case of oppression under color of right. A threat to discharge him was not a means of injuring his property. There was no property unlawfully to injure. Flynn was not prevented in any way from selling his labor to others. The parties were free to make a new agreement or modify the old one. Flynn had no property right to be retained as an employee of the defendant, and his discharge by the defendant was not actionable. The defendant stands in quite a different position with respect to the complainant than he would be if he threatened or endeavored to prevent complainant working for a third party by whom Flynn had been employed and which might have been continued in that case but for the wrongful action of the defendant.

Defendant had the right to contract for labor for hire, which necessarily included the right to fix the price subject to agreement therefor and to stipulate the manner of its performance, the mode and time of payment. (*Lowe* v. *Rees Printing Co.*, 41 Neb. 127; 59 N. W. 362.) Correspondingly, the laborer had the same right to sell his labor and to contract therefor just as an owner of any other property; and the employer, as well as the employee, enjoyed the right which each might even arbitrarily exercise to terminate the contract of employment at any time. The power to dispose of it according to the will of the owner is ever present. (*Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *Matter of Marshall*, 102 Fed. 323, 324; *Matter of Parrott*, 1 id. 481, 505, 507.) There

was no threat " to have him discharged " here, nor was there any compulsion to pay in the instant case. It cannot be held under all the circumstances of this case that the evidence before the grand jury shows an invasion of any right of the complainant.

Under the circumstances, I do not believe that there was any extortion here either under the common law or the present-day statute. (See 3 Whart. Crim. Law [11th ed.], § 1898, and cases cited.)

The question here involved is of such vast importance to the People and to the defendant that the People should seek to have the disposition of this case reviewed on appeal, if so advised.

Motion to dismiss indictment is granted.