MICHAEL LARSEN et al., Copartners Doing Business under the Name of ICELAND RESTAURANT COMPANY, Plaintiffs, *v.* RICHARD McCANN, as President of Associated Musicians of Greater New York, Local 802, American Federation of Musicians, an Unincorporated Association, et al., Defendants.

Supreme Court, Special Term, New York County, February 19, 1947.

*Deane Ramey* for plaintiffs.

*Harry Sacher* for defendants.

CHURCH, J. The plaintiffs seek to recover from the defendants' union the sum of $981.74 which they deposited with the union in the following circumstances: Between January, 1941, and October 15, 1945, plaintiffs operated a restaurant and night club in which they employed members of defendant union as instrumental musicians. During that period plaintiffs' restaurant and night club was classified by the union's executive board as a class B restaurant and they paid the musicians the minimum rates of compensation fixed by the union for class B restaurants and night clubs. On October 15, 1945, the secretary of the union advised plaintiffs in writing that commencing with the 22d day of October, 1945, the plaintiffs' restaurant and night club would be classified as a class A restaurant and that plaintiffs would be required to pay the musicians employed by them the minimum rates of compensation which the union's executive board had established for all class A restaurants and night clubs. Plaintiffs objected to the reclassification of their restaurant and night

club and were given a hearing before the union's executive board. After the hearing, plaintiffs were advised by the executive board that the reclassification would stand and that plaintiffs would be required to pay the minimum scale fixed for class A restaurants and night clubs. Thereafter plaintiffs, in order to avoid a strike by the musicians for the higher rates of pay demanded by the union, deposited with the union the sum of $981.74, which represented the difference between the compensation which plaintiffs had paid their musicians under the old rates and the amount to which they were entitled under the new rates for the period of several weeks which elapsed between the date on which the reclassification became effective and the date on which plaintiffs sold their restaurant and night club to third persons. The money was deposited with the union on the understanding that the sum would be returned to plaintiffs if they succeeded in this action, and paid out to the musicians employed by plaintiffs during the above-mentioned period, if plaintiffs failed to recover herein.

All that the plaintiff's claim amounts to is that they were induced to pay the higher wages demanded by the union because they could not obtain the services of the union's members unless such payment were made. Obviously, such a claim does not give rise to any cause of action. An employer is free to deny employment to workers unless the workers are willing to accept employment at the wages and upon the terms and conditions which he offers them. By the same token workers in private industry are free to refuse employment or withdraw from employment unless the employer is willing to meet their terms as to wages, hours and working conditions. Workers, in the absence of statute, cannot base a claim against an employer for wages greater than those which they agreed to accept on the ground that their consent to the lower wage was involuntary and dictated by their economic necessities. By the same token employers, in the absence of statute, cannot base a claim for a return of a portion of the wages which they agreed to pay on the ground that their consent to higher wages was involuntary and dictated by their need of the workers' services. These propositions are well settled in our jurisprudence. In *People* v. *Cuddihy* (151 Misc. 318, affd. 243 App. Div. 694) where the defendant was indicted for extortion and coercion because he had exacted from the complaining witness, as a condition of giving him employment, the repayment of a substantial portion of the union's scale of wages, the court dismissed the indictment, say-

ing, at page 324: " Defendant had the right to contract for labor for hire, which necessarily included the right to fix the price subject to agreement therefor and to stipulate the manner of its performance, the mode and time of payment. (*Lowe* v. *Rees Printing Co.*, 41 Neb. 127; 50 N. W. 362.) Correspondingly, the laborer had the same right to sell his labor and to contract therefor just as an owner of any other property; and the employer, as well as the employee, enjoyed the right which each might even *arbitrarily* exercise to terminate the contract of employment at any time. The power to dispose of it according to the will of the owner is ever present." (Emphasis supplied.)

Long before the foregoing was written, the Court of Appeals expressed the same doctrine, when it said in *Bossert* v. *Dhuy* (221 N. Y. 342, 352–353): " ' It is not the duty of one man to work for another unless he has agreed to, and if he has so agreed but for no fixed period, either may end the contract whenever he chooses. The one may work, or refuse to work, at will, and the other may hire or discharge at will. The terms of employment are subject to mutual agreement, without let or hindrance from any one. If the terms do not suit, or the employer does not please, the right to quit is absolute, and no one may demand a reason therefor. Whatever one man may do alone, he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of the act. Workingmen have the right to organize for the purpose of securing higher wages, shorter hours of labor or improving their relations with their employers. They have the right to strike; that is, to cease working in a body by prearrangement until a grievance is redressed, provided the object is not to gratify malice or inflict injury upon others, but to secure better terms of employment for themselves.' "

Plaintiffs seem to be of the belief that the courts are censors of the reasonableness and propriety of labor's economic demands. They are not, of course. But even if they were, there is no evidence in this record that the union acted unreasonably or arbitrarily or in bad faith. On the contrary, plaintiff Larsen admitted so many substantial changes in the character of plaintiffs' business, as well as in its practices, as to require a holding, if this court were vested with the jurisdiction to make such holding, that the union acted in the proper exercise of its discretion when it reclassified plaintiffs' restaurant and night club.

Larsen admitted that when the plaintiffs first opened the restaurant in 1941 they featured a ninety-nine cent dinner and

that later they abandoned that dinner and in its place featured a $1.49 dinner. Larsen testified that a very substantial alteration of the premises was made in the latter part of 1944 or the beginning of 1945, when plaintiffs opened a street-level cocktail lounge which increased the patronage and volume of business done by its restaurant and night club. In addition, he testified that beginning with February or March, 1945, plaintiffs made it a uniform practice to require a minimum charge of $2 per person on every night of the week, whereas previous to that time the minimum charge was made only on Saturday nights and on very rare occasions during the week. The character of the change effected by the opening of the cocktail lounge is well revealed in the following quotation from an article in the New York Sun of Friday, April 6, 1945: '' Iceland now boasts one of the smartest cocktail lounges on Broadway. Modern decor, soft lights and a quiet atmosphere make a very attractive setting. The new room is at street level and may be patronized without going downstairs to Mike Larsen's fine restaurant, though it is doubtful if many miss doing that.''

The changes which the plaintiffs made in the nature and practices of their business were of such proportions that beginning in 1945 they advertised the Iceland Restaurant as '' Broadway's Biggest Night Club ''.

If the court had the power to pass upon the reasonableness and propriety of the union's action in reclassifying the restaurant from B to A, the wages for which had hitherto been established with approval of National War Labor Board, it cannot say that the union, in reclassifying plaintiffs' restaurant and night club, had acted unreasonably and arbitrarily and in bad faith.

The court takes judicial notice of the Stabilization Act of 1942 (U. S. Code, tit. 50, Appendix, § 961 *et seq.*) and of various Executive Orders issued by the President pursuant to the act in respect to the stabilization of wages, the purport of all of which was that employers could not lawfully pay and employees could not lawfully accept, during the war period, wage increases without the approval of the National War Labor Board. However, on August 18, 1945, the President promulgated Executive Order No. 9599 (Code of Fed. Reg., 1945 Supp., tit. 3, p. 104) which provides in subdivision 1 of section IV thereof as follows: '' The National War Labor Board, and such other agencies as may be designated by the Director of Economic Stabilization with the approval of the Director of War Mobilization and Reconversion, are authorized to provide that *employers may,*

*through collective bargaining with duly certified or recognized representatives of the employees involved or, if there is no representative, by voluntary action, make wage or salary increases without the necessity of obtaining approval therefor,* upon the condition that such increases will not be used in whole or in part as the basis for seeking an increase in price ceilings, or for resisting otherwise justifiable reductions in price ceilings * * *.'' (Emphasis supplied.)

On the same day, i.e., August 18, 1945, the National War Labor Board issued its General Order No. 40 (Code of Fed. Reg., 1945 Supp., tit. 29, § 803.40) reading as follows: '' (a) *Employers may, through collective bargaining with duly certified or recognized representatives of the employees involved, or, if there is no such representative, by voluntary action, make wage or salary increases without the necessity of obtaining approval therefor,* upon the condition that such increases will not be used in whole or in part as the basis for seeking an increase in price ceilings or for resisting otherwise justifiable reductions in price ceilings, or, in the case of products or services being furnished under contract with a Federal procurement agency, will not increase the cost to the United States.

'' (b) The provisions of paragraph (a) above [of this section] shall be effective as of August 18, 1945, but this shall not preclude the selection by the party or parties of any earlier date as the effective date of the wage or salary increase. The provisions of this general order [section] shall not, however, operate as an approval of any wage or salary increase put into effect before August 18, 1945, and prior to receipt of any approval required by the Stabilization Act of October 2, 1942, or the orders or regulations issued thereunder.

'' (c) Wage or salary increases referred to in paragraph (a) above [of this section] may be made notwithstanding any previous denial or modification of an application for approval thereof by the National War Labor Board or its agencies.'' (Emphasis supplied.)

Under the foregoing provisions it was clearly lawful and proper for the union to demand and for the plaintiffs to pay the wage increases sought by the union without obtaining approval of the National War Labor Board. In this respect the case at bar is clearly distinguishable from the case of *Kells* v. *Boutross* (184 Misc. 206) *wherein, prior to August 18, 1945,* plaintiff sought recovery of a wage increase which had not been approved by the National War Labor Board. Prior

to the President's Executive Order No. 9599 and the National War Labor Board's General Order No. 40, both issued on August 18, 1945, it was, of course, necessary to obtain approval of the National War Labor Board for a wage increase. Thereafter, however, the need for such approval no longer existed because of the provisions contained in the Presidential Executive Order and the National War Labor Board's General Order No. 40.

The facts which the court deems essential are found as noted in the margin of the proposed findings of fact and conclusions of law. Settle decision and judgment in favor of the defendant union, dismissing on the merits, on the law and the facts, the plaintiffs' complaint, with costs.