John DOOLEY, John B. Jones III, David Gratzer, Nyle Griffin, Dan Reyes and Caitlin Ann, LLC, Plaintiffs,

v.

CRAB BOAT OWNERS ASSOCIATION, Fishermen's Marketing Association of Bodega Bay, Half Moon Bay Fishermen's Marketing Association, John Morgan, Morgan Fish Company, Inc., Duncan Maclean, Todd Wailey, Jim Salter, Robert N. Miller, Michael Mchenry, David Bettencourt, Larry Collins, William Wise, John T. Tarantino, and George Boos, Defendants.

No. C02–0676 MHP.

United States District Court, N.D. California.

July 14, 2003.

Paul F. Higaki, Attorney at Law, Oakland, CA, Karien L. Balluff, Young deNormandie & Oscarsson, P.C., Seattle, WA, for Plaintiffs.

Geri Lynn Green, Law Offices of Geri Lynn Green, Michael A. Duncheon, Hanson Bridgett Marcus Vlahos & Rudy LLP, San Francisco, CA, for Defendants.

## MEMORANDUM & ORDER

### Motion for Partial Judgment and Motion for Summary Judgment

PATEL, Chief Judge.

The Caitlin Ann fishing company, its managing director John Dooley, and several crew members bring this action against three fishing associations and their members, as well as a purveyor of fish, seeking relief for alleged interference with the Caitlin Ann's Dungeness crab harvesting off the coast of California. Now before the court are defendants' motion for partial judgment on plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, and plaintiffs' motion for summary judgment on a defendant's[1] counterclaims. After having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

## BACKGROUND

The Caitlin Ann company, a Washington limited liability corporation, is the owner of a fishing boat also named the Caitlin Ann. JSUF ¶ 4; First Am. Compl. ¶ 4. Under the management of Dooley, the company harvests Dungeness crab off the coast of California, Washington and Oregon. First Am. Compl. ¶ 5. Both plaintiffs and defendants agree that crabs are harvested commercially using steel and wire traps, or pots, that rest on the ocean floor. JSUF ¶ 7. A buoy, attached to each pot, acts as a marker for the fishermen. *Id.*

The parties agree on little else. According to plaintiffs, the conflict between the parties began when the State of California opened the Northern California Dungeness crab season on December 1, 1999. First Am. Compl. ¶ 30. Plaintiffs contend that two fishermen's marketing associations not named in this action refused to harvest crab in an effort to negotiate a favorable fixed price with buyers. *Id.* In solidarity, members of the three defendant associations—the Crab Boat Owners Association

---

1. Defendant Half Moon Bay Fishermen's Marketing Association brought the counterclaims. Answer & Countercl.

("CBOA"), the Fishermen's Marketing Association Incorporated of Bodega Bay ("FMABB"), and the Half Moon Bay Fishermen's Marketing Association ("HMBFMA")—also allegedly refused to fish in order to gain a better price. *Id.* ¶ 31. Plaintiffs, however, did not join the "strike." *Id.* ¶ 32. When the Caitlin Ann boat returned to port on or about December 10, 1999, plaintiffs claim that a group of angry HMBFMA members confronted the crew and yelled "scabs." *Id.* ¶ 33. Dooley later discovered that the word "scab" had been spray painted on the side of the vessel. *Id.* ¶ 35. During the next crab season, members of the three associations allegedly refused to sell their crab to Three Captains, the company that bought "scab crab" from plaintiffs. *Id.* ¶ 36.

When the Southern California Dungeness crab season opened the next year on November 15, 2001, plaintiffs claim that the three defendant associations and their members once again refused to fish so as to fix a favorable price. *Id.* ¶¶ 38 & 39. The Caitlin Ann company had already contracted with a buyer, Exclusive Fresh, and planned to harvest crab once the season began. *Id.* ¶ 37. Before the boat left on November 16, 2001, plaintiffs allege that two association members threatened Dooley with trouble if he harvested crab during the strike, and a group of members came to the dock and threatened the crew. *Id.* ¶¶ 42 & 48. The FMABB president, defendant William Wise, also allegedly threatened Bodega Bay Fish to prevent the company from providing bait or purchasing crab from another fisherman who planned to fish during the strike. *Id.* ¶ 47. On November 17, 2001, the crew of the Caitlin Ann returned to an area they had set with pots and found approximately 400 lines had been cut. *Id.* ¶ 50. The next day, the crew discovered about 200 more cut lines, for a total of 647 pots lost. *Id.* Plaintiffs allege that defendant Todd Whaley,[2] a member of one or more of the defendant associations, was involved in cutting the lines. *Id.* ¶ 54. After Caitlin Ann's crew had begun fishing, Exclusive Fresh refused to perform its contract with Caitlin Ann, allegedly because of threats from association members. *Id.* ¶¶ 43–46.

Dooley intended to return to Half Moon Bay on November 19, 2001 and had made plans with the harbormaster to use the transient dock, the only space that could accommodate a boat the size of the Caitlin Ann. *Id.* ¶¶ 58 & 59. When Dooley arrived at the harbor, however, the transient dock was blocked by another boat owned by defendant Duncan Maclean, a HMBFMA member. *Id.* ¶ 60. Plaintiffs contend that Maclean, encouraged by the associations, deliberately blocked the Caitlin Ann from docking in order to punish plaintiffs for harvesting crab during the strike. *Id.* Plaintiffs sailed to San Francisco, resulting in additional costs and loss of crab. *Id.* ¶ 61. After plaintiffs found a new buyer for their crab, J & S Quality Seafood, members of the associations allegedly threatened the owner of J & S with "blackballing" if he purchased "scab crab." *Id.* ¶ 64. The members were allegedly assisted by defendant John Morgan, owner of Morgan Fish, a large purveyor of Dungeness crab. *Id.* ¶¶ 62–65. Plaintiffs contend that once J & S bought plaintiffs' crab, Morgan contacted customers of J & S to dissuade them from purchasing the crab and even intercepted customers in front of the J & S store. *Id.* ¶ 65. When the associations agreed on a fixed "ex-vessel" price with buyers on or about December 5, 2001, they allegedly refused to sell crab to J & S.[3] *Id.* ¶¶ 66–67.

---

**2.** Plaintiffs erroneously spelled his name Wailey in their complaint. Whaley Answer.

**3.** As explained by plaintiffs, members of the associations sell crab at a fixed price through market orders issued by the associations.

In turn, defendant HMBFMA alleges in its counterclaims that the Caitlin Ann company and Dooley (collectively "counterdefendants") sold crab below cost from 1999 to the present, used a boat that had a trawling net in violation of state permitting requirements, and in 1999 fished in a wasteful and destructive manner. Countercl. ¶¶ 7, 8 & 9. HMBFMA also alleges that counterdefendants threatened HMBFMA members and other fishermen with damage to their fishing gear, and did in fact damage gear by trawling through fishing areas already set with pots. *Id.* ¶ 10.

*LEGAL STANDARD*

I. *Motion for Judgment on the Pleadings*

After all parties have submitted their pleadings, any party may invoke Federal Rule of Civil Procedure 12(c) and move for judgment on the pleadings as long as consideration of the motion does not delay trial. Fed.R.Civ.P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989). The court accepts all allegations of the nonmoving party as true. *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir.1984). If the court reviews matters outside the pleadings, the motion is properly treated as a motion for summary judgment. Fed.R.Civ.P. 12(c).

II. *Motion for Summary Judgment*

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Without a market order, members will not sell crab to a purchaser. First Am. Compl. ¶ 67.

Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 959–60 (9th Cir.1994). Nor is it sufficient for the opposing party simply to raise issues as to the credibility of the moving party's evidence. *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983). If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is 'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)).

*DISCUSSION*

Defendants argue that they are entitled to judgment on plaintiffs' RICO claim be-

cause plaintiffs have not alleged sufficient predicate acts under the Hobbs Act. Relying on a recent Supreme Court opinion, *Scheidler v. National Organization for Women,* 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003), defendants contend that the predicate acts alleged by plaintiffs would not violate the Hobbs Act since defendants would not have obtained any property of plaintiffs. Plaintiffs argue, however, that *Scheidler* does not apply to actions in which individuals use threats and intimidation to gain control over a competitor's right to operate a business.

Counterdefendants contend that this court should grant summary judgment on HMBFMA's counterclaims because HMBFMA cannot put forth any facts supporting its allegations. Counterdefendants also argue that HMBFMA does not allege adequate facts in its counterclaims to support some of the causes of action. In response, HMBFMA attacks the admissibility of evidence presented by counterdefendants and argues that it should be given more time to pursue discovery under Federal Rule of Civil Procedure 56(f).

## I. *Plaintiffs' RICO Claim*

Plaintiffs seek treble damages under the civil provisions of RICO for acts of ex-

tortion prohibited by the Hobbs Act. Specifically, plaintiffs contend that defendants violated RICO section 1962(c) and conspired to violate section 1962(c), which is itself a violation of RICO section 1962(d). 18 U.S.C. § 1962(c), (d). Section 1962(c) prohibits individuals whose actions affect interstate commerce from using an enterprise to engage in a "pattern of racketeering activity." 18 U.S.C. § 1962(c). An indictable offense under the Hobbs Act is considered "racketeering activity," 18 U.S.C. § 1961(1)(B), and two or more such offenses within ten years are a "pattern," 18 U.S.C. § 1961(5). Thus, in order to determine whether plaintiffs have stated a claim under RICO, this court must decide whether at least two of the predicate acts alleged by plaintiffs are violations of the Hobbs Act.

In relevant part, the Hobbs Act prohibits extortion, or an attempt or conspiracy to commit extortion, that in any manner affects interstate commerce. 18 U.S.C. § 1951(a).[4] Threats or acts of physical violence "in furtherance of a plan or purpose to do anything in violation of this section" are also prohibited. *Id.* Plaintiffs allege that the following nine acts violate the Hobbs Act:[5]

---

4. In full, the Hobbs Act provision at issue states:

 Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

 18 U.S.C. § 1951(a).

5. In predicate acts 1, 7 and 9, plaintiffs do not claim that the acts constituted extortion or an attempt or conspiracy to commit extortion. Instead, they allege acts of physical violence

against persons or property. First Am. Compl. ¶¶ 73, 82 & 84. Plaintiffs do not argue in this motion that the court should treat these three allegations as separate grounds for a RICO action. This court notes that stand-alone allegations of physical violence are not sufficient to state a claim under the Hobbs Act. *United States v. Franks,* 511 F.2d 25, 31 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975) (finding that the statute does not "proscribe[ ] all physical violence obstructing, delaying, or affecting commerce," but "physical violence designed to culminate in extortion"). Thus, this court must still determine if the alleged physical violence by defendants was in furtherance of a scheme to obtain property from the defendants.

(1) Members of the associations at the direction of defendant Maclean spray-painted the word "scab" on the Caitlin Ann boat, First Am. Compl. ¶ 73;

(2) Defendants Mclean and Michael McHenry, as well as other members of the associations, threatened Exclusive Fresh with loss of business so that the company reneged on its promise to purchase crab from plaintiffs, *id.* ¶ 75;

(3) Defendant Morgan and other members of the associations threatened J & S Quality Seafood with loss of business if the company purchased crab from plaintiffs, *id.* ¶ 77;

(4) Defendant Morgan and his company, Morgan Fish, threatened buyers and customers of J & S Quality Seafood with loss of business if they purchased "scab crab" from the company, *id.* ¶ 78;

(5) Defendant Maclean and other members of the associations maliciously blocked the Caitlin Ann boat from docking and unloading crab at the transient dock in Half Moon Bay by tying another boat to the dock, *id.* ¶ 79;

(6) In a telephone conference call with the defendant associations and other marketing associations from California and Oregon, a representative of CBOA stated that J & S Quality Seafood would not get a "market order," *id.* ¶ 81;

(7) Defendants Maclean, Jim Salter and other members of the associations threatened the crew of the Caitlin Ann with harm if they went fishing, *id.* ¶ 82;

(8) Defendant William Wise and FMABB threatened Bodega Bay Fish with loss of business if the company provided bait to another fisherman, Richard Axelson, who planned to go fishing during the strike in November 2001, *id.* ¶ 83; and

(9) Defendant Whaley as well as members of the associations conspired to and were involved in cutting the lines to the Caitlin Ann's crab pots, *id.* ¶ 84.

Defendants contend that none of these acts, even if proved, could be considered extortion or attempted extortion because defendants did not obtain or try to obtain property. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The most that could have been achieved by these acts, defendants argue, is that plaintiffs ceased their fishing operations during the strike. Such a result would deprive plaintiffs of their property but would not transfer that property to defendants.

Defendants rely almost exclusively on *Scheidler* for their argument.[6] In *Scheidler*, the Court faced the unique question whether RICO should apply to the acts of anti-abortion advocates who protested in front of clinics offering abortions. The respondents in *Scheidler* alleged that the protestors violated the Hobbs Act by interfering with female patients' rights to seek

---

**6.** Defendants also cite *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), for the proposition that "to obtain" requires both deprivation and acquisition of property. They quote a footnote in which the Court stated that "extortion requires an intent 'to obtain that which in justice and equity the party is not entitled to receive.'" *Id.* at 406 n. 16, 93 S.Ct. 1007 (quoting *People v. Cuddihy*, 151 Misc. 318, 271 N.Y.S. 450, 456 (N.Y.Gen.Sess.1934),

aff'd, 243 A.D. 694, 277 N.Y.S. 960 (N.Y.App. Div.1935)). The Court never addressed the definition of "obtain" in *Enmons*. Instead, as is clear from the sentence preceding that quoted by defendants, the Court's decision concerned whether violence associated with union activities was a violation of the Hobbs Act. *Id.* ("Judicial construction of the New York statute reinforces the conclusion that, however militant, union activities to obtain higher wages do not constitute extortion.").

medical services, clinic staffs' rights to perform their jobs, and clinics' rights to provide services without being threatened. 123 S.Ct. at 1063. The protestors gained control over the use of assets by interfering with these rights, respondents argued, and therefore committed extortion. *Id.* at 1063–64, 123 S.Ct. 1057. Although the Court suggested that the patient's right was more properly characterized as a liberty interest rather than a property interest, *id.* at 1064 n. 5, the opinion focused on whether interference with the ability to exercise these rights could be considered "obtaining" of property by the protestors.

After analyzing the legislative history of the Hobbs Act and its origins in New York penal law, the Court found that extortion required petitioners to pursue or receive " 'something of value from' respondents that they could exercise, transfer, or sell." *Id.* at 1066 (quoting *United States v. Nardello,* 393 U.S. 286, 290, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969)). Even when the protestors succeeded in shutting down the clinics, depriving them of control of their assets, the Court reasoned that the protestors could not be said to have acquired the clinics' property. *Id. Scheidler* distinguished extortion from the lesser offense of coercion. Coercion, which the Court found more appropriately described the protestors' conduct, "involves the use of force or threat of force to restrict another's freedom of action." *Id.*

Plaintiffs contend that *Scheidler* does not extend to actions such as the ones at issue in this action, in which an individual seeks control over a competitor's right to operate a business. In discussing the limits of extortion under the Hobbs Act, the *Scheidler* court left open the possibility that the right to operate a business could be "obtained" by opining that "liability might be based on something as intangible as another's right to exercise exclusive control over the use of a party's business assets." 123 S.Ct. at 1064. The Court then cited *United States v. Tropiano,* 418 F.2d 1069 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970), and specifically stated that it did not reach or reject the holding that the "intangible right to solicit refuse collection accounts" was property under the Hobbs Act. 123 S.Ct. at 1064 n. 6. In *Tropiano,* owners of the C & A Refuse Removal Company and their partner threatened Caron, the owner of a competing collection company, with injury unless he stopped soliciting "their" accounts. Because of these threats, Caron agreed not to solicit any more business in the area, including accounts already serviced by C & A. Noting that the "right to pursue a lawful business including the solicitation of customers necessary to the conduct of such business has long been recognized as a property right," the Second Circuit concluded that the owners of C & A obtained property from Caron under the Hobbs Act. *Tropiano,* 418 F.2d at 1075–76.

Taken together, the Court's statements in *Scheidler* lead to the conclusion that if an individual gains control over the use of a competitor's business asset, even if the asset is as intangible as the right to solicit business, that person has obtained the property of another within the meaning of the Hobbs Act. The individual that gains control over the use of a competing business's asset does more than coerce by restricting the competing business's freedom of action. That person extorts by acquiring something of value that can be exercised to his benefit. The C & A company in *Tropiano* gained control over Caron's right to solicit accounts in a particular area, a control which was admittedly valuable because the company could retain its accounts and charge higher prices without fear of competition. The company could wield this control every time its competi-

tor, Caron, wished to bid for an account. In contrast, the anti-abortion protestors did not acquire anything of value even when they closed down the clinics, though they may have felt vindicated at their success.[7]

■ Similarly, taking plaintiffs' allegations as true for the purposes of this motion, the defendants in the action at bar attempted to gain control over the Caitlin Ann company's property right to harvest crab during the crab season. Defendants threatened injury to the crew of the Caitlin Ann, damaged the boat and its fishing equipment, and warned purchasers and their customers that they would be blackballed if they bought crab from plaintiffs. Through these actions, defendants sought to keep Caitlin Ann from harvesting crab during the strike. Like the refuse removal companies in *Tropiano*, defendants in this action did more than restrict their competitor's activities; defendants attempted to acquire "something of value" through their threats, warnings and property damage. Control over the Caitlin Ann company's fishing operations during the crab season was of value to defendants. If the defendants exercised their control to stop Caitlin Ann from harvesting crab during the strikes, defendants could have bettered their bargaining position with purchasers and received a higher price for their crab. That defendants in fact failed to halt the Caitlin Ann's operations does not affect the analysis, since the Hobbs Act reaches both actual extortion and attempts or conspiracies to commit extortion.

This court finds that predicate acts 2, 3, 4, 7, 8 and 9 could support a claim of attempted extortion within the meaning of the Hobbs Act. These are acts in which the named defendants attempted through threats and property damage to obtain control over the Caitlin Ann company's intangible property right to harvest crab during the crab season. The remaining acts 1, 5 and 6 will be considered as overt acts, which plaintiffs may attempt to prove at trial. Material issues of fact thus remain to be resolved, and defendants are not entitled to a judgment on the pleadings.[8]

## II. *HMBFMA's Counterclaims*

In its counterclaims, HMBFMA alleges firstly that counterdefendants engaged in unlawful or unfair business practices pursuant to the California Unfair Competition Act ("UCA"), Cal. Bus. & Prof.Code

---

**7.** In an earlier *Scheidler* opinion, the Supreme Court held that the Hobbs Act does not require "economic motivation" for extortion. *National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). The court does not attempt to impose such a requirement in this action, but notes that it may be easier to meet the definition of "obtaining" set out by the Court in its 2002 *Scheidler* opinion if there is an economic purpose for attempted control of an intangible property right.

**8.** In their reply brief, defendants cite *Enmons* to argue for the first time that there was no extortion since the purpose of their "strike" was lawful. This argument was not raised in defendants' motion and thus plaintiffs have not had an opportunity to respond. Defendants' argument, however, fails on its face. In *Enmons*, the Court held that violence accompanying a lawful strike was not extortion within the Hobbs Act because it was not "wrongful." 410 U.S. at 401, 93 S.Ct. 1007. The Court reasoned that Congress must have intended the Hobbs Act to apply "to those instances where the obtaining of the property would itself be 'wrongful' because the extortionist has no lawful claim to the property." *Enmons*, 410 U.S. at 400, 93 S.Ct. 1007. In this action, however, the property at issue is not the price of crab, but plaintiffs' right to harvest crab during the crab season. Defendants' attempts to obtain that property, if proved, would be wrongful since they have no legal interest in the property.

§ 17200 *et seq.*, through the following acts: selling crab below cost in violation of section 17043 of the California Business and Professions Code; fishing with a trawling net in violation of section 8280.1 of the California Fish and Game Code; fishing in a destructive and wanton manner; threatening HMBFMA members and other fishermen with damage to their fishing gear; and damaging the fishing gear by trawling off the cost of central California. Secondly, HMBFMA alleges as a separate claim that below cost sales of crab violate section 17043 of the California Business and Professions Code. Thirdly, HMBFMA alleges that counterdefendants' threats and damage to crab gear create tortious interference with prospective economic advantage.

Counterdefendants challenge HMBFMA's basis for its allegations, and contend that HMBFMA has not put forth any evidence to support its claims. In response, HMBFMA requests the court to stay this motion pursuant to Federal Rule of Civil Procedure 56(f) until HMBFMA has pursued additional discovery.

### A. *Predatory Pricing*

■■■■ Section 17043 provides: "It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." Cal. Bus. & Prof.Code § 17043. Thus, the elements of a claim are: (1) an article or

product is sold (2) at less than the cost to the seller (3) for the purpose of injuring competitors or destroying competition. The cost is a "fully allocated cost" or "fully distributed cost." *Turnbull & Turnbull v. ARA Transp., Inc.*, 219 Cal.App.3d 811, 819–20, 268 Cal.Rptr. 856 (1990). To meet the purpose requirement, the vendor "must act with the purpose, i.e., the desire, of injuring competitors or destroying competition." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 175, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (finding it is not enough that a plaintiff knows such a result will occur). Thus, a vendor who sells below cost "[i]n an endeavor made in good faith to meet the legal prices of a competitor selling the same article or product, in the same locality or trade area and in the ordinary channels of trade" does not violate section 17043. Cal. Bus. & Prof.Code § 17050(d).[9]

Counterdefendants contend that HMBFMA has not set forth any facts on these elements to show that there are genuine issues for trial.[10] HMBFMA replies that it must conduct further discovery to determine Dooley's fully allocated cost and whether he had the requisite intent. This court, however, has not seen *any* supporting evidence for *any element* of the predatory pricing claim. Before deciding whether to allow further discovery, the court orders HMBFMA to submit declarations explaining the reasonable basis for its predatory pricing allegations.

---

**9.** Sales below cost may constitute unfair business practices under the UCA even if the seller did not act with the purpose of destroying competition. *Cel–Tech Communications, Inc.*, 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527. A sale below cost is an unfair business practice if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a

violation of the law, or otherwise significantly threatens or harms competition." *Id.*

**10.** Counterdefendants also argue that they could not have intended to injure competition because they sold crab during the strike at a higher price than the one HMBFMA ultimately negotiated. This argument is not on point; the relevant inquiry is whether the vendor sold the item below the cost to *him* with an intent to injure competition.

## B. Violation of Permit Requirements

 An act is an unlawful business practice under the UCA if it is both a business practice and forbidden by law.[11] *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal.4th 553, 560, 71 Cal. Rptr.2d 731, 950 P.2d 1086 (1998). HMBFMA alleges that counterdefendants engaged in unlawful business practices when they violated section 8280.1 of the California Fish and Game Code by procuring and renewing a permit for Dungeness crab with a vessel that was equipped with a trawling net. HMBFMA also alleges that counterdefendants transferred the permit from Dooley to Caitlin Ann in violation of section 8280.1.[12] A Dungeness crab permit may be issued to someone with a commercial fishing license that has not been suspended or revoked who is, "at the time of application, the owner of a fishing vessel that is not equipped for trawling with a net." Cal. Fish & Game Code § 8280.1(b)(3). A fisherman may have only one Dungeness crab permit, and that permit is nontransferable. *Id.*

HMBFMA has not produced any evidence to show that counterdefendants violated section 8280.1. In HMBFMA's response to discovery, it stated that its allegations were supported by counterdefendants, Duncan Maclean, and documents from the Department of Fish and Game and the United States Coast Guard.[13] The court therefore orders HMBFMA to submit declarations explaining the reasonable basis for its unlawful business practices allegations.

## C. Tortious Interference with Prospective Economic Advantage

 To prove tortious interference with prospective economic advantage, HMBFMA must show: "(1) an economic relationship between [HMBFMA] and some third party, with the probability of future economic benefit to HMBFMA; (2) [counterdefendants'] knowledge of the relationship; (3) intentional acts on the part of [counterdefendants] designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to [HMBFMA] proximately caused by the acts of [counterdefendants]." *Youst v. Longo*, 43 Cal.3d 64, 71 n. 6, 233 Cal.Rptr. 294, 729 P.2d 728 (1987). The economic

---

11. Contrary to counterdefendants' argument, an *unlawful* business practice (as opposed to an *unfair* business practice) need not significantly threaten or harm competition. *See Cel–Tech Communications, Inc.*, 20 Cal.4th at 187 n. 12, 83 Cal.Rptr.2d 548, 973 P.2d 527 ("This case involves an action by a competitor alleging anticompetitive practices. Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law such as … 'unlawful' business practices.")

12. To the extent HMBFMA alleges that counterdefendants' crab fishing without a valid permit was 'an unlawful business practice, this is not a separate cognizable claim. Section 8280.1 does not prohibit fishing for crab with a vessel that has a trawl net. The unlawful business practice at issue is procuring a permit for a vessel that at the time has a trawl net, in violation of section 8280.1. HMBFMA also mentions other sections of the Fish and Game Code in its papers, but violations of these sections were not alleged in its counterclaims.

13. The court notes that the California Department of Fish and Game records do not demonstrate that counterdefendants had a vessel equipped with a trawl net at the time they applied for a permit or renewed their permit. The records also do not show that the permit was transferred from Dooley to Caitlin Ann. In assailing these records because they lack authentication, HMBFMA misunderstands its burden on a summary judgment motion. HMBFMA must do more than attack counterdefendants' evidence; it must affirmatively put forth facts to show a genuine issue for trial.

relationship must be either in the form of a contract or an existing relationship with an identifiable third party. *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App.4th 507, 522, 527, 49 Cal.Rptr.2d 793 (1996).

HMBFMA contends that counterdefendants threatened to drag, and did drag, a trawling net over fishing areas in order to deter HMBFMA members from placing their crab pots there, and the trawling did in fact damage their fishing gear. In its response to counterdefendants' interrogatory, HMBFMA stated that this allegation is supported by counterdefendants and Jim Salter. HMBFMA has provided no evidence on any element of this claim, and thus the court orders HMBFMA to submit declarations explaining the reasonable basis for its interference allegations.

*CONCLUSION*

IT IS HEREBY ORDERED that defendants' motion for partial summary judgment is DENIED and counterdefendants' motion for summary judgment is CONTINUED in accordance with the foregoing. HMBFMA is ordered to submit declarations showing a reasonable basis for its counterclaims within 20 days, at which time the court will determine whether to allow additional discovery before ruling on counterdefendants' motion.