[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 5, 2005
THOMAS K. KAHN
CLERK

No. 04-11152
Non-Argument Calendar
_____

D.C. Docket No. 01-14019-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMIRO RAMOS,
a.k.a. "EL CHAGAN," etc.,
d.b.a. "R&A HARVESTING,"

Defendant-Appellant.

_____

_____

No. 04-12923
_____

D.C. Docket No. 01-14019-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN RAMOS,

a.k.a. NENO, etc.,
d.b.a. R&A HARVESTING, etc.,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(May 5, 2005)

Before CARNES, HULL and MARCUS, Circuit Judges.

PER CURIAM:

This is the second time this case has been before this Court. In the first appeal, this Court vacated two of the four convictions of defendants Ramiro Ramos and Juan Ramos and vacated their 147-month sentences. On remand, the district court sentenced both defendants to 60 months' imprisonment on count 1 and 120 months' imprisonment on count 4. In this appeal, the defendants challenge their new sentences. After review, we affirm.

## I. BACKGROUND

### A.     Trial Evidence

The defendants are brothers who used threats to prevent migrant workers from leaving their employment, housed the migrant workers in abysmal conditions, kept the migrant workers under surveillance, and kept the migrant

2

workers in debt for the duration of the harvesting season. Further, the defendants assaulted Jose Martinez, the owner of a transportation service for migrant farm workers, with the intent of inducing Martinez not to transport migrant farm workers out of Lake Placid, Florida.

At the defendants' trial, Martinez and Alejandro Benitez, an employee of Martinez, testified about the assault. Further, three migrant workers testified as to their living conditions.

On June 26, 2002, a jury convicted both defendants of: conspiracy to violate the laws of the United States by keeping migrant workers in involuntary servitude, in violation of 18 U.S.C. § 371 (count 1); interference with commerce through extortion by threats or violence, in violation of 18 U.S.C. §§ 1951 and 2 (count 2); use of a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924 and 2 (count 3); and harboring illegal aliens from January 1, 2000, to June 20, 2001, in violation of 8 U.S.C. § 1324 and 18 U.S.C. § 2 (count 4).

## B.     The First Sentencing and Appeal

After the trial, the district court sentenced both defendants to three concurrent 63-month terms of imprisonment on counts 1, 2, and 4, and to a consecutive 84-month sentence as to count 3, for a total of 147 months' imprisonment.

In their first appeal, the defendants raised several challenges to their convictions and sentences. Specifically, the defendants argued that: (1) their convictions for offenses based on extortion were invalid under Scheidler v. National Organization for Women, Inc., 537 U.S. 393, 123 S. Ct. 1057 (2003) because they did not obtain any property during the commission of their offenses;[1] (2) the prosecutor engaged in misconduct during its opening statement; and (3) certain evidence introduced by the government was untimely and inadmissible.

This Court rejected the defendants' evidentiary and prosecutorial misconduct arguments. However, we determined that because the defendants had not obtained any property during the commission of their offenses, an element of extortion had not been met pursuant to Scheidler. Accordingly, we vacated both defendants' convictions and sentences on counts 2 and 3 in full, and also their convictions and sentences on count 1, to the extent the conspiracy alleged in count 1 relied on extortion. United States v. Ramos, No. 02-16478, at 7 (11th Cir. Sept. 26, 2003).

We noted, however, that the defendants still had valid convictions for: (1) conspiracy to violate the laws of the United States by keeping migrant workers in

_____

[1]In Scheidler, the Supreme Court held that extortion under 18 U.S.C. § 1951 (The Hobbs Anti-Racketeering Act) requires that a person must actually obtain property from another party. 537 U.S. at 404, 123 S. Ct. at 1065.

involuntary servitude (count 1); and (2) harboring illegal aliens (count 4). We thus remanded for resentencing on these convictions.

## C.    Resentencing

On remand, the district court ordered revised PSIs for both defendants. After grouping the offenses, the PSIs determined that the count producing the highest offense level was count 1, the conspiracy to commit involuntary-servitude offense. The Guideline for that offense is U.S.S.G. § 2H4.1(a)(1), which sets the base offense level at 22.[2]

In addition, § 2H4.1(b)(4)(B) increases that base offense level if "any other felony offense" was committed during the involuntary-servitude offense and the offense level for that other felony offense is greater. Specifically, § 2H4.1(b)(4) provides:

> (4)    <u>If any other felony offense was committed</u> during the commission of, or in connection with, the peonage or involuntary servitude offense, <u>increase to the greater of</u>:
> (A)    2  plus the offense level as determined above, or
> (B)    <u>2 plus the offense level from the offense guideline applicable to that other offense</u>, but in no event greater than level 43.

---

[2]The applicable Guideline for conspiracy, § 2X1.1, refers to the substantive offense. In this case, the substantive offense is involuntary servitude, in violation of 18 U.S.C. § 1584. The Guideline for a § 1584 offense is § 2H4.1(a)(1). All citations are to the 2002 version of the Guidelines.

U.S.S.G. §§ 2H4.1(b)(4)(A)-(B) (emphasis added). In addition to their involuntary-servitude offense, the defendants were convicted of another felony: harboring illegal aliens in violation of 8 U.S.C. § 1324. The PSI indicated that the offense level for this other felony – harboring illegal aliens – was higher and thus controlled the offense level for the involuntary-servitude offense.

While U.S.S.G. § 2L1.1 sets the base offense level at 12 for harboring illegal aliens, the PSI recommended a nine-level enhancement under § 2L1.1(b)(2)(C) because the defendants' harboring-illegal-aliens offense involved more than 100 aliens; a four-level enhancement under § 2L1.1(b)(4)(B) because the defendants brandished a firearm during the May 27, 2000 assault on Martinez; and a six-level enhancement under § 2L1.1(b)(6)(3) because Martinez sustained permanent bodily injury. Accordingly, the PSI recommended: (1) an offense level of 31 for the harboring-illegal-aliens offense (12+9+4+6); and (2) an offense level of 33 for the involuntary-servitude offense (two plus the offense level of 31 from the harboring-illegal-aliens offense). See U.S.S.G. § 2H4.1(b)(4)(B).

The PSI also recommended a two-level enhancement for Ramiro Ramos for obstruction of justice. Thus, Ramiro Ramos's total offense level was 35 and Juan Ramos's total offense level was 33. Both defendants had a criminal history category of I.

6

At resentencing, the district court adopted the Guidelines calculations in the PSI. Further, the district court accepted the government's argument that the trial evidence showed that both defendants were leaders of the organization and deserved leadership role enhancements. The four-level leadership-role enhancement resulted in a total offense level of 39 for Ramiro Ramos and 37 for Juan Ramos. Thus, Ramiro Ramos's Guidelines range was 262-327 months' imprisonment, and Juan Ramos's Guidelines range was 210-262 months' imprisonment.

Ultimately, the district court sentenced both defendants to only 60 months' imprisonment on the involuntary-servitude offense and 120 months' imprisonment on count 4 to run consecutively, for a total of 180 months' imprisonment. The sentences were based on the statutory maximums for each offense.[3]

The defendants timely appealed.

## II. DISCUSSION

### A. Application of § 2H4.1(b)(4)(B)

The defendants' principal argument is that the district court incorrectly applied §§ 2H4.1(b)(4)(B) and 2L1.1 in sentencing them. The defendants do not

---

[3]The statutory maximum for the involuntary-servitude offense is 60 months' imprisonment. 18 U.S.C. § 371. The statutory maximum for the harboring-illegal-aliens offense is 120 months' imprisonment. 8 U.S.C. § 1324(a)(2).

challenge that the trial evidence showed that they assaulted and threatened Martinez on May 27, 2000 with firearms. Instead, the defendants primarily argue that the assault on Martinez, including the use of firearms, was not connected to their harboring-illegal-aliens offense and should not be used to enhance their sentences. They also argue that the district court erred in determining that the injury Martinez sustained during the assault was "permanent" for purposes of § 2L1.1(b)(6)(3), and that the defendants harbored more than 100 illegal aliens.[4]

During the sentencing hearing, the district court found that the trial evidence showed that the assault was part of the defendants' offenses. Further, the district court determined that the trial evidence showed that the defendants harbored more than 100 illegal aliens and that Martinez's injury was permanent. We recount some of the trial evidence.

As to the May 27, 2000 assault, the trial evidence indicated that the defendants approached vans owned by Martinez and threatened to kill Marcos Orozco, a van driver. The defendants also threatened Alejandro Benitez, another van driver. Further, the defendants repeatedly hit Martinez with a gun, kicked him

---

[4]The defendants made these same objections at sentencing. During the sentencing hearing, the district court overruled the defendants' objections. This Court reviews the district court's application of the Guidelines de novo and its factual findings for clear error. United States v. Grant, 397 F.3d 1330, 1332 (11th Cir. 2005).

until he lost consciousness, and accused him of "taking away" their "people." Moreover, the defendants vandalized the vans that Martinez used to transport migrant workers, and Ramiro Ramos threatened to kill Martinez.

The offenses that gave rise to the charges in counts 1 and 4 occurred from January 2000 to June 2001. The May 27, 2000 altercation with Martinez occurred during that time and the trial evidence showed that it was committed in order to induce Martinez to stop transporting migrant workers outside of their area because they felt Martinez's business threatened their efforts to harbor illegal aliens. We thus conclude that the district court did not clearly err in finding that the assault on Martinez was connected to defendants' harboring-illegal-aliens offense.

The district court also did not clearly err in finding that the defendants harbored substantially more than 100 aliens. The trial testimony of the Social Security Administration and Border Patrol agents was sufficient to support that fact-finding. Specifically, at trial, an agent with the Social Security Administration testified that based on the I-9 forms submitted by the defendants for the period from January 1, 2000 through June 30, 2001, only sixteen of their approximately 680 workers had valid social security numbers. Further, an agent from the United States Border Patrol testified that the I-9 forms submitted by the defendants reflected that only ten of the workers had valid alien registration

9

numbers, an eight-digit number assigned to individuals lawfully admitted to the United States for permanent residence.

Finally, at trial, Martinez also testified that as a result of the injuries received during the altercation, he sustained a scar from his hairline to the bridge of his nose and a permanent scar on his lip. The permanency of Martinez's scar is sufficient to classify his injury as a permanent or life-threatening bodily injury.[5] See United States v. Torrealba, 339 F.3d 1238, 1246 (11th Cir. 2003), cert. denied, 540 U.S. 1207, 124 S. Ct. 1481 (2004) ("[T]he plain language of application note 1[(g)] encompasses injuries that may not be terribly severe but are permanent, hence the disjunctive: 'permanent or life-threatening injuries.'" (internal quotation marks and citation omitted)).

Accordingly, the district court did not err in calculating the defendants' sentences under §§ 2H4.1(b)(4)(B) and 2L1.1.[6]

---

[5]The Guidelines define permanent or life-threatening bodily injury as an "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent." U.S.S.G. § 1B1.1 cmt. n.1(g).

[6]The entire briefing on appeal as to Juan Ramos was completed on November 1, 2004. On March 11, 2005, Juan Ramos filed a motion for leave to file a supplemental brief to raise constitutional issues about his sentencing enhancements pursuant to United States v. Booker, 543 U.S. __, 125 S. Ct. 738 (2005). While Juan Ramos's initial brief on appeal challenged the sufficiency of the evidence as to his enhancements and whether § 2H4.1(b)(4)(B) was an applicable guideline, it did not raise any constitutional issues about those enhancements or the Guidelines even though Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004) was decided on June 24, 2004, well prior to the filing of Juan Ramos's brief. Because Juan Ramos did not raise any constitutional

## B.  Vindictive Sentencing

Relying on North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072 (1969), the defendants contend that the district court's decision to impose a harsher sentence than it did originally gives rise to a presumption that the court acted vindictively, and that the district court failed to articulate reasons for imposing the longer sentence that are sufficient to rebut that presumption, thus establishing a violation of their due process rights.[7]  We disagree.

issues in his initial brief, we deem those issues abandoned.  See United States v. Dockery, 401 F.3d 1261, 1262 (11th Cir. 2005) (declining to consider Booker issue when defendant failed to timely raise it in his initial brief); United States v. Nealy, 232 F.3d 825, 830 (11th Cir. 2000) ("Defendant abandoned the [Apprendi] indictment issue by not raising the issue in his initial brief."); see also United States v. Levy, 379 F.3d 1241, 1242 (11th Cir. 2004), petition for cert. filed, March 1, 2005 (No. 04-8942) (declining to consider Blakely issue raised for the first time in petition for rehearing). Accordingly, we deny Juan Ramos's March 11, 2005 motion for leave to file a supplemental brief to raise new issues.

We also point out that the defendants did not raise any constitutional issues under the Sixth Amendment in the district court and thus at most we would review the defendants' Booker issues for plain error.  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005), petition for cert. filed, February 23, 2005 (73 U.S.L.W. 3531).  Even if the defendants could show error that was plain, they would be unable to satisfy the third prong of plain-error review.  As discussed above, the district court's fact-findings were not clearly erroneous and supported the defendants' enhancements. The Booker error is not the use of extra-verdict enhancements, but "the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge. . . ." Id. at 1301. Nothing in the record indicates that the defendants' sentences would have been different under an advisory Guidelines scheme.  In fact, the 60- and 120-month sentences were the result of the statutory maximums for their offenses, and those maximums were below even the low end of the applicable Guidelines ranges, which were 262-327 months' imprisonment for Ramiro Ramos and 210-262 months' imprisonment for Juan Ramos.

[7]In Pearce, the Supreme Court held that if a more severe sentence is imposed following appeal, the reasons for the harsher sentence must appear on the record and must be "based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding."  395 U.S. at 726, 89 S. Ct. at 2081.  In Alabama v. Smith, 490 U.S. 794, 109 S. Ct. 2201 (1989), the Supreme Court clarified the Pearce doctrine by

First, as determined above, at resentencing the district court properly determined the defendants' Guidelines calculations. In the original sentencing, when the probation office applied § 2H4.1, the Guideline for involuntary servitude, it incorrectly cross-referenced the Guideline applicable to extortion instead of the higher Guideline in § 2L1.1 for harboring illegal aliens. Although we are not excusing the incorrect calculations that were used at the first sentencing, we do not attribute the correct application of § 2H4.1 at resentencing to vindictiveness. See United States v. Edwards, 225 F.3d 991, 993 (8th Cir. 2000) ("[T]here is no indication of vindictiveness in resentencing a defendant to exactly the sentence that the defendant would have received but for the erroneous application of [the Guidelines]."); United States v. Duso, 42 F.3d 365, 369 (6th Cir. 1994) ("If the district judge errs in favor of the defendant, however, the defendant bears the risk that the error may be corrected against the defendant's favor [on resentencing].").[8]

---

explaining that the presumption of vindictiveness applies only where there is a "reasonable likelihood" that the increase in the sentence is the product of actual vindictiveness, and if the presumption does not apply, the defendant must prove actual vindictiveness. Smith 490 U.S. at 799, 109 S. Ct. 2204-05.

[8]At resentencing, the district court also correctly applied the obstruction-of-justice and leadership-role enhancements. The obstruction-of-justice and leadership-role enhancements were the result of the government's timely objections to the PSI upon resentencing. The government attempted to make those same objections at the original sentencing; however, they were untimely. The district court was permitted to consider the objections on remand because they were timely and

12

Further, the transcript of the resentencing hearing reflects that the district court carefully considered each of the parties' objections, detailed the basis for its calculations, and explained the reasons the new sentences were longer than the original sentences. See United States v. Cox, 299 F.3d 143, 149-50 (2d Cir. 2002) (finding no vindictiveness and stating "the district court throughout these proceedings carefully notified the parties of its concerns, considered their arguments and submissions, and deliberately laid out its rationale").

## C.    Entitlement to Lesser Sentences

The defendants also argue that they were entitled to a lesser sentence on remand because two of their convictions were vacated. We disagree. It is well-settled that a defendant is not entitled to a shorter sentence just because one or more counts of conviction are dismissed on appeal and he is resentenced on the remaining counts. See United States v. Warda, 285 F.3d 573, 580-81 (7th Cir. 2002); see also United States v. Stinson, 97 F.3d 466, 469 (11th Cir. 1996).

## III. CONCLUSION

---

because the sentencing process had started anew. See United States v. Stinson, 97 F.3d 466, 469 (11th Cir. 1996) ("[W]hen a criminal sentence is vacated, it becomes void in its entirety; the sentence – including any enhancements – has been wholly nullified and the slate wiped clean." (internal quotation marks and citation omitted)). Further, there is no evidence in the record that these enhancements were the result of vindictiveness. In any event, as explained in footnote 6, the defendants received lower sentences than the Guidelines range for their offenses due to the applicable statutory maximums.

For the above reasons, we affirm the defendants' sentences.

**AFFIRMED.**